722 S.E.2d 566

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Larry S. WHITE, II, Defendant Below, Appellant.**

No. 35529.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 12, 2011.

Decided Feb. 10, 2011.

Concurring and Dissenting in Part Opinion of Justice Alsop Aug. 18, 2011.

534

Matthew L. Clark, Kayser Layne & Clark, PLLC, Point Pleasant, WV, for Appellant.

Darrell V. McGraw, Jr., Attorney General, Barbara H. Allen, Managing Deputy Attorney General, Charleston, WV, for Appellee.

DAVIS, Justice:

In this appeal, Larry S. White, II, defendant below (hereinafter referred to as "Mr. White"), challenges an order of the Circuit Court of Jackson County convicting him of one count of first-degree murder and one count of conspiracy to commit a felony, and sentencing him to life with mercy for the first-degree murder conviction, and a consecutive sentence of one to five years for the conspiracy. Mr. White contends that the trial court committed the following errors: (1) failing to grant his motions to strike two prospective jurors; (2) convicting him upon insufficient evidence; (3) admitting evidence that was the fruit of an unlawful search of a cellular telephone; (4) admitting certain out-of-court statements under Rule 801(d)(2)(E) of the West Virginia Rules of Evidence; and (5) refusing to grant his "Amended Renewed Motion for New Trial" based upon alleged violations of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). After a thorough review of this appeal, we find no error. We therefore affirm the circuit court's order.

## I.

### FACTUAL AND PROCEDURAL HISTORY

According to the evidence presented at trial,[1] at the time relevant to the instant matter, the defendant, Mr. White, and Roseann Osborne, the victim's wife (hereinafter referred to as "Ms. Osborne"), had been romantically involved for some time, had lived together for nearly a year, and had a young child together, notwithstanding the fact that Ms. Osborne was, throughout this time, married to Mohammed Mahrous (hereinafter referred to as "Mr. Mahrous"). There also was evidence that Mr. White and Ms. Osborne had, at various times, discussed

---

1. Additional facts necessary to address some of the issues raised by Mr. White will be set out along with our discussion of those particular issues.

their desire to murder Mr. Mahrous in the presence of one of their friends, Angelina Barney.

Sometime after 9:15 p.m. on September 17, 2007, Ms. Osborne and her husband, Mr. Mahrous, met at Riverfront Park in Ravenswood, West Virginia. Ms. Osborne drove to the park in a yellow Ford truck that was owned by her husband, and her husband drove to the park in a vehicle she owned. While Ms. Osborne and Mr. Mahrous were at the park, Mr. White approached them and inflicted three forceful blows to Mr. Mahrous's head with a hammer, causing his death. The evidence established that the hammer was in a plastic bag during the attack. The plastic bag, stained with traces of Mr. Mahrous's blood, was later discovered on the river bank, and a subsequent search of the river produced the hammer. Stuck to the hammer was a piece of the plastic bag.

Following the attack, Mr. White departed from the park, while, at approximately 10:22 p.m., Ms. Osborne called the Jackson County 911 Center and reported that her husband had been attacked by an unknown assailant who first asked him for a cigarette and then began to strike him in the head. Ms. Osborne gave a description of the assailant that did not match Mr. White. Police and Emergency personnel responded, and Mr. Mahrous was pronounced dead at the scene.

The yellow Ford truck and Ms. Osborne's vehicle were transported to the city maintenance garage in Ravenswood, West Virginia, and, relevant to this case, a search warrant was obtained to search the truck. Among other things, a Motorola cellular telephone was seized during the search. The telephone led investigators to the defendant, Mr. White, who was then in the State of Indiana. Officers traveled to Indiana to take a statement from Mr. White. During the course of a six-hour interview, Mr. White ultimately confessed to killing Mr. Mahrous by striking him in the head with a hammer. Following the investigation, a grand jury indicted Mr. White and Ms. Osborne with murder in the first degree and conspiracy to commit mur-

der in the first degree. Mr. White and Ms. Osborne were tried separately.[2]

At trial, Mr. White did not dispute that he had killed Mr. Mahrous. Rather, he presented a diminished capacity defense, arguing that he lacked the ability to premeditate and deliberate Mr. Mahrous's murder. The jury found him guilty of murder in the first degree with a recommendation of mercy, and likewise found him guilty of conspiracy to commit a felony. Mr. White filed a motion for a new trial, and the motion was denied. The trial court then sentenced him to life with mercy for the charge of first-degree murder, and a term of not less than one year nor more than five years for the conspiracy charge. The two sentences are to be served consecutively. Mr. White then filed an "Amended Renewed Motion for New Trial." The trial court denied the motion, and this appeal followed.

## II.

### STANDARD OF REVIEW

■ This case is on appeal from the trial court's order denying Mr. White's motion for a new trial. With respect to a trial court's denial of a motion for a new trial, this Court has explained that,

" '[a]lthough the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.' Syl. pt. 4, *Sanders v. Georgia–Pacific Corp.,* 159 W.Va. 621, 225 S.E.2d 218 (1976)." Syllabus point 1, *Andrews v. Reynolds Memorial Hospital, Inc.,* 201 W.Va. 624, 499 S.E.2d 846 (1997).

Syl. pt. 1, *Lively v. Rufus,* 207 W.Va. 436, 533 S.E.2d 662 (2000).

■ Most of the contended errors raised by Mr. White in this appeal are subject to particular standards of review, which standards will be set out in connection with

**2.** Ms. Osborne's trial was subsequent to Mr. White's, and she also was found guilty of both charges.

our discussion of the alleged errors to which they pertain. Nevertheless, we note here that our general standards for reviewing findings and rulings made by a trial court have been described in this way:

In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000). *See also Tennant v. Marion Health Care Found.*, 194 W.Va. 97, 104, 459 S.E.2d 374, 381 (1995) ("We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review."). With this general standard in mind, we proceed to address the issues herein raised by Mr. White.

### III.

### DISCUSSION

On Appeal, Mr. White has set forth several assignments of error. We will address each assertion separately.

### A. *Jurors*

Mr. White first argues that the trial court erred in failing to grant his motions to strike for cause two prospective jurors, Michelle Lemon and Cassia Scott, based upon their bias or prejudice allegedly revealed during voir dire.[3] The State replies that there was no abuse of discretion on the part of the trial court in denying Mr. White's motions to

**3.** Mr. White used his peremptory challenges to remove the two jurors; however, he correctly observes that

[t]he language of W. Va.Code, 62–3–3 (1949), grants a defendant the specific right to reserve his or her peremptory challenges until an unbiased jury panel is assembled. Consequently, if

strike the prospective jurors, as their voir dire responses did not demonstrate any bias or prejudice.

**1. Standard of Review.** As the State correctly observes, "[t]he determination of whether a prospective juror should be excused to avoid bias or prejudice in the jury panel is a matter within the sound discretion of the trial judge." *O'Dell v. Miller*, 211 W.Va. 285, 288, 565 S.E.2d 407, 410 (2002). *See also State v. Miller*, 197 W.Va. 588, 605, 476 S.E.2d 535, 552 (1996) ("The trial court has broad discretion in determining whether to strike jurors for cause, and we will reverse only where actual prejudice is demonstrated." (citation and footnote omitted)). With respect to this Court's standard for reviewing a trial court's ruling on a motion to disqualify a juror, it has been further established that,

[i]n reviewing the qualifications of a jury to serve in a criminal case, we follow a three-step process. Our review is plenary as to legal questions such as the statutory qualifications for jurors; clearly erroneous as to whether the facts support the grounds relied upon for disqualification; and an abuse of discretion as to the reasonableness of the procedure employed and the ruling on disqualification by the trial court.

*State v. Miller*, 197 W.Va. 588, 600–01, 476 S.E.2d 535, 547–48 (1996).

**2. Discussion.** Having considered the proper standard for our review of this issue, we turn to our analysis, first noting that

[t]he relevant test for determining whether a juror is biased is whether the juror had such a fixed opinion that he or she could not judge impartially the guilt of the defendant. Even though a juror swears that he or she could set aside any opinion he or she might hold and decide

a defendant validly challenges a prospective juror for cause and the trial court fails to remove the juror, reversible error results even if a defendant subsequently uses his peremptory challenge to correct the trial court's error. Syl. pt. 8, *State v. Phillips*, 194 W.Va. 569, 461 S.E.2d 75 (1995).

the case on the evidence, a juror's protestation of impartiality should not be credited if the other facts in the record indicate to the contrary.

Syl. pt. 4, *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535. Furthermore, "[a]ctual bias can be shown either by a juror's own admission of bias or by proof of specific facts which show the juror has such prejudice or connection with the parties at trial that bias is presumed." Syl. pt. 5, *id.*

■ The basis for Mr. White's objection to Ms. Lemon was that she had a relationship with a detective who was the lead investigator in the case. However, the circuit court concluded that Ms. Lemon's only connection was with the detective's mother. In this regard, Ms. Lemon stated the following during voir dire:

PANEL MEMBER [Ms. Lemon]: I know Tony Boggs through his mother.

THE COURT: Okay.

PANEL MEMBER: But that is it. I do some work for his mom sometimes, clean house or whatever.

THE COURT: Do you know him beyond his name and who he is?

PANEL MEMBER: Not really.

THE COURT: Okay. Okay.

During individual voir dire, Ms. Lemon was questioned further as follows by the Prosecuting Attorney:

Q. I don't believe you raised your hand for hearing anything or reading anything in the paper did you?

A. Other than kind of—on Tony, just outside of his—for his mom, that's it.

Q. And so you don't know anything about this case from her or anything like that?

A. No, No.

Q. Would your relationship with his mother effect the way you would view his testimony at all?

A. No.

In addition, Ms. Lemon was questioned by the defense and gave the following answers:

Q. How long have you known Tony's mom?

A. Well, she lives at the end of my road, so I've been there, what, ten years or whatever. And I go there frequently, and haven't seen him over there—but haven't been over there for probably another year now, since I've working another job, so.

The trial court overruled Mr. White's objection and concluded that "the evidence from the juror doesn't really establish a personal relationship between the juror and Lieutenant Boggs. And even if it did, her answer to the question was that it would not influence her decision making in the case."

Upon our review of Ms. Lemon's voir dire and the circuit court's conclusions regarding the same, we find no error in the circuit court's decision to not disqualify her. Ms. Lemon clearly had no personal relationship with Lieutenant Boggs,[4] and we find nothing in her responses to indicate that she had a "fixed opinion" of this case or that she could not "judge impartially the guilt of the defendant." Syl. pt. 4, in part, *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535.

■ The basis for Mr. White's objection to Ms. Scott was her equivocal answers with respect to whether she would consider psychological testimony in the same manner she would consider police testimony.[5] During

4. We previously have held that a personal relationship between a prospective juror and a law enforcement official actively involved in the prosecution of the case may provide grounds for disqualification of the prospective juror. *See* Syl. pt. 6, in part, *State v. Beckett*, 172 W.Va. 817, 310 S.E.2d 883 (1983) ("A prospective juror's ... social relationship with an employee of a law enforcement agency does not operate as a per se disqualification for cause in a criminal case unless the law enforcement official is actively involved in the prosecution of the case. After establishing that such a relationship exists, a

party has a right to obtain individual voir dire of the challenged juror to determine possible prejudice or bias arising from the relationship.").

5. Before this Court, Mr. White additionally argues, for the first time, that Ms. Scott should have been disqualified based upon her employment with the Jackson County Circuit Clerk's office during the time this case was initiated, and based upon "equivocal" answers she gave when questioned regarding her ability to be objective in light of the fact that Mr. White had engaged in

her individual voir dire, Ms. Scott was questioned by the defense, in part, as follows:

> Q. ... And I'll try to phrase this question correctly: There is going to be some psychological evidence introduced in this case, okay, that Mr. White was suffering from a mental disease or defect at the time of the commission of the alleged crime, okay? Would you be able to consider that psychology testimony in the same manner you would consider police testimony?
>
> A. Are you asking me if I would be able to believe it?
>
> Q. Consider it in the same way, with the same critical eye as you would police testimony.
>
> A. I mean, I would like to say yes, but I—I feel that I could, but—I don't know if there is a right answer, I feel—I mean, I don't know if I could—I think I could.
>
> Q. But are you just not sure?
>
> A. I'm not sure if I would believe it or not, that is what I don't know if I'm supposed to answer yes or no.
>
> Q. Okay. That's a different question.
>
> A. Yea, I mean, I would consider it, of course, but I just don't know whether I would believe it or not.
>
> Q. Okay. Do you have any reason to cast a more critical eye towards psychological testimony than you would other testimony?
>
> A. I don't think so. I don't believe so at all. I mean, I do truly believe that there is psychological things that happen, I just don't know that it's—If I'm going to believe it in this case or not. I just don't know.
>
> Q. And you shouldn't at this point.
>
> A. Right, and I have no way of answering that.

The trial court overruled Mr. White's objection and explained that "I really thought that Mrs. Scott would be completely open to your defense, I thought. She said— well, as the prosecutor said, she said that she would consider it, of course." We agree with the trial court's conclusion regarding prospective juror Scott. Ms. Scott was clear in stating that she would consider the psychological evidence. She merely qualified this answer by pointing out that she had not yet heard the psychological evidence that would be presented in this case, and, therefore, she could not express an opinion as to how she would perceive that evidence. We find no indication of bias or prejudice.

We note that

> [t]he challenging party bears the burden of persuading the trial court that the juror is partial and subject to being excused for cause. An appellate court only should interfere with a trial court's discretionary ruling on a juror's qualification to serve because of bias only when it is left with a clear and definite impression that a prospective juror would be unable faithfully and impartially to apply the law.

Syl. pt. 6, *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996). Because we find no indication that either prospective juror Lemon or prospective juror Scott would have been "unable faithfully and impartially to apply the law," we conclude that the trial court did not abuse its discretion in refusing to disqualify them. Syl. pt. 6, in part, *id.*

### B. Sufficiency of the Evidence

Mr. White next argues that the trial court erred in failing to grant both his pre-verdict and post-verdict motions for judgment of acquittal, which were based upon insufficiency of the evidence.[6] Specifically, Mr. White

---

an extra-marital affair. Insofar as these grounds were not raised in the trial court, they are not properly raised on appeal. *See State v. Salmons*, 203 W.Va. 561, 509 S.E.2d 842 (1998) ("As a general matter, a defendant may not assign as error, for the first time on direct appeal, an issue that could have been presented initially for review by the trial court on a post-trial motion.").

**6.** In his brief, Mr. White mischaracterizes the issue by claiming that the trial court erred by

failing to grant him a new trial based upon insufficiency of the evidence. Of course, if the evidence had been insufficient then Mr. White could not be retried. *See* Syl. pt. 2, *State v. Clayton*, 173 W.Va. 414, 317 S.E.2d 499 (1984) ("Our State and federal double jeopardy clauses prohibit retrial of a defendant on any charge for which he has received a judgment of acquittal or a court's determination that there was insufficient evidence to prove that charge at his first trial.").

claims that, with respect to the first-degree murder charge, there was insufficient evidence that he acted with premeditation and deliberation.[7] In addition, Mr. White claims there was insufficient evidence upon which the jury could base a finding of conspiracy[8] because there was no evidence demonstrating a common plan. The State responds that there was sufficient evidence for a jury to convict Mr. White of both first-degree murder and conspiracy to commit a felony. Following a statement of our standard for reviewing the sufficiency of the evidence to support a criminal conviction, we will address these two issues in turn.

### ▇▇▇▇▇ 1. Standard of Review. This Court has explained that

[t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. pt. 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). Furthermore,

[a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as

the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. pt. 3, *id.* We additionally note that,

[w]hen a criminal defendant undertakes a sufficiency challenge, all the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict. This rule requires the trial court judge to resolve all evidentiary conflicts and credibility questions in the prosecution's favor; moreover, as among competing inferences of which two or more are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt.

Syl. pt. 2, *State v. LaRock,* 196 W.Va. 294, 470 S.E.2d 613 (1996). We will now consider, separately, Mr. White's insufficiency of the evidence arguments.

### ▇▇▇ 2. Insufficiency of the evidence of first-degree murder. Mr. White contends

that there was insufficient evidence of premeditation and deliberation to support his conviction of first-degree murder. The record in this case demonstrates that the evidence put on by Mr. White to show a lack of premeditation and deliberation was based upon a defense of diminished capacity. We note that, in briefing the issue of insufficiency of the evidence of first-degree murder, Mr. White has not relied on the evidence he put forth to establish his diminished capacity.

---

7. Pursuant to W. Va.Code § 61–2–1 (1991) (Repl. Vol.2010),

> Murder by poison, lying in wait, imprisonment, starving, *or by any willful, deliberate and premeditated killing,* or in the commission of, or attempt to commit, arson, kidnaping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four, chapter sixty-a of this code, is murder of the

first degree. All other murder is murder of the second degree.

(Emphasis added).

8. Under West Virginia Code § 61–10–31 (1971) (Repl.Vol.2010), "[i]t shall be unlawful for two or more persons to conspire ... to commit any offense against the State, ... one or more of such persons does any act to effect the object of the conspiracy."

Instead, his brief summarily states that the evidence was insufficient to establish premeditation and deliberation.[9] For the purpose of addressing this issue, we will assume Mr. White is basing his argument, at least in part, upon his diminished capacity defense.

The evidence pertaining to Mr. White's diminished capacity was controverted. While Mr. White presented expert testimony that he suffered from "Delusional Disorder–Persecutory Type" that prevented him from being able to premeditate and deliberate or form the specific intent to kill Mohammed Mahrous, the State rebutted that testimony with its own expert who opined that "[t]here was no sign of mental disease or defect or disorder. None." Thus, there was sufficient evidence, provided by the State's expert, from which the jury could conclude that Mr. White possessed the mental capacity to premeditate and deliberate the murder of Mr. Mahrous.

 In addition, there was sufficient evidence to establish that Mr. White actually premeditated and deliberated Mr. Mahrous's murder. Premeditation and deliberation are typically established by circumstantial evidence:

> As a practical matter, premeditation generally can be proved only by circumstantial evidence. Because the defendant's mental processes are wholly subjective, it is seldom possible to prove them directly. If premeditation is found, it must ordinarily be inferred from the objective facts. Accordingly, if one voluntarily does an act, the direct and natural tendency of which is to destroy another's life, it fairly may be inferred, in the absence of evidence to the contrary, that the destruction of that other's life was intended.

State v. LaRock, 196 W.Va. 294, 305, 470 S.E.2d 613, 624 (1996). Furthermore, we have held that,

> [a]lthough premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.

Syl. pt. 5, State v. Guthrie, 194 W.Va. 657, 461 S.E.2d 163 (1995).

The record in this case demonstrates that there was sufficient evidence from which the jury could find, beyond a reasonable doubt, that Mr. Mahrous's murder was carried out by Mr. White with premeditation and deliberation. Notably, in his statement to the police, which was published in full to the jury, Mr. White admitted that, on the night he killed Mr. Mahrous, he followed Ms. Osborne and Mr. Mahrous to Riverfront Park, and that he approached Mr. Mahrous while carrying a hammer in a white plastic bag. The jury could infer from this evidence that Mr. White placed the hammer in the plastic bag to keep his fingerprints off of the hammer, which is an action that plainly demonstrates deliberation and premeditation. The jury could further find deliberation and premeditation by Mr. White based upon the reasonable conclusion that the bag also was used to conceal the hammer and thereby allow Mr. White to approach Mr. Mahrous in a non-threatening way to facilitate a surprise attack. The absence of defensive wounds on Mr. Mahrous supports evidence of a surprise attack. In addition, Mr. White admitted in his statement that he struck Mr. Mahrous with the hammer, and that, after striking Mr. Mahrous, he threw the hammer, got into his vehicle, and fled the scene. Based upon this

---

9. Typically, this Court will not address issues that have not been properly briefed. *See State, Dep't of Health & Human Res. v. Robert Morris N.*, 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995) (" 'A skeletal "argument," really nothing more than an assertion, does not preserve a claim....' " (citation omitted)). *See also Farmer v. Knight*, 207 W.Va. 716, 722, 536 S.E.2d 140, 146 (2000) (per curiam) (" 'It is ... well settled ... that casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal.' " (quoting *State v. Lilly*, 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995))); *Albright v. White*, 202 W.Va. 292, 298 n. 9, 503 S.E.2d 860, 866 n. 9 (1998) (declining to address issues on appeal that had not been adequately briefed). Notwithstanding this rule, we will address the instant issue because the State has briefed the matter.

evidence, we find no error in the circuit court's conclusion that the evidence was sufficient to support the jury's finding of premeditation and deliberation.

**3. Insufficiency of evidence of conspiracy to commit a felony.** Mr. White argues further that there was insufficient evidence upon which the jury could find him guilty of conspiracy because there was no evidence demonstrating a common plan. We disagree.

> " 'In order for the State to prove a conspiracy under W. Va.Code, 61–10–31(1), it must show that the defendant agreed with others to commit an offense against the State and that some overt act was taken by a member of the conspiracy to effect the object of that conspiracy.' Syl. Pt. 4, *State v. Less*, 170 W.Va. 259, 294 S.E.2d 62 (1981)." Syl. Pt. 3, *State v. Burd*, 187 W.Va. 415, 419 S.E.2d 676 (1991).

Syl. pt. 5, *State v. Minigh*, 224 W.Va. 112, 680 S.E.2d 127 (2009). Furthermore, this Court has explained that

> [t]he agreement to commit an offense is the essential element of the crime of conspiracy—it is the conduct prohibited by the statute. The agreement may be inferred from the words and actions of the conspirators, or other circumstantial evidence, and the State is not required to show the formalities of an agreement.

*State v. Less*, 170 W.Va. 259, 265, 294 S.E.2d 62, 67 (1981).

As the trial court observed, there was sufficient circumstantial evidence in this case from which the jury could infer that an agreement to kill Mr. Mahrous existed between Mr. White and Ms. Osborne. Specifi-

cally, a friend of Ms. Osborne testified that Ms. Osborne and Mr. White had, in her presence, frequently discussed killing Mr. Mahrous. More persuasive, however, was evidence of numerous telephone calls between Mr. White and Ms. Osborne on the day of Mr. Mahrous's murder, including several that occurred in the hour leading up to and immediately following the murder.[10] Additionally, in Mr. White's confession to police officers, he admitted that Ms. Osborne told him she and her husband were going to Riverfront Park. Finally, Ms. Osborne's attempts to conceal the identity of the killer following the murder, in her call to the 911 emergency center, in a conversation she had with her friend Angelina Barney during which she denied that Mr. White had committed the murder,[11] and in statements she made to police officers, further established the existence of a conspiracy. This evidence provided a sufficient basis for the jury to have concluded, beyond a reasonable doubt, that Mr. White had conspired with Ms. Osborne to murder Mr. Mahrous.

Because there was sufficient evidence presented at trial to establish, beyond a reasonable doubt, that Mr. White possessed the capacity to premeditate and deliberate Mr. Mahrous's murder, that he did in fact commit the murder with premeditation and deliberation, and that he conspired with Ms. Osborne to commit the murder, we conclude that the trial court did not err in denying Mr. White's *pre-verdict and post-verdict motions for acquittal.*

### C. Rule 801(d)(2)(E) of the West Virginia Rules of Evidence

Mr. White argues that the trial court erred in admitting certain statements [12] made by

---

**10.** The evidence at trial established that there had been fifty-nine calls between Mr. White's cellular telephone and the cellular telephone being used by co-defendant Ms. Osborne on the day of the murder, and seven of those calls occurred close to the time of the murder, at 9:22 p.m., 9:25 p.m., 9:29 p.m., 9:59 p.m., 10:02 p.m., 10:07 p.m., and 10:23 p.m.

**11.** See note 12, *infra*, for additional details regarding Ms. Osborne's comments to Ms. Barney.

**12.** The statements Mr. White sought to exclude included two statements entered into evidence

during the testimony of Ms. Osborne's friend, Angelina Barney. One of the statements involved Ms. Osborne's comments to Mr. White expressing her desire to murder Mr. Mahrous, which were made in Ms. Barney's presence, the other statement was made in a telephone call to Ms. Barney after Mr. Mahrous's murder in which Ms. Osborne described the murder to Ms. Barney as having been committed by someone other than Mr. White. During the course of the conversation, Ms. Barney asked Ms. Osborne where Mr. White was, Ms. Osborne replied "He is away at work. It wasn't him. I know it wasn't him." Two additional statements sought to be excluded by Mr. White were made by Ms. Osborne in two

co-defendant Roseann Osborne as statements of a co-conspirator under Rule 801(d)(2)(E). Mr. White contends that the State failed to establish a proper foundation for the admission of this evidence. The State contends that a proper foundation was provided; therefore, the court's admission of the challenged statements was proper. Before addressing this issue, we consider the proper standard for our review.

■■■ **1. Standard of Review.** This Court has plainly established that "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. pt. 4, *State v. Rodoussakis,* 204 W.Va. 58, 511 S.E.2d 469 (1998). *Accord* Syl. pt. 2, *State v. Peyatt,* 173 W.Va. 317, 315 S.E.2d 574 (1983) (" 'Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk,* 171 W.Va. 639, [643,] 301 S.E.2d 596, 599 (1983)."). With this standard in mind, we will consider the trial court's rulings on the challenged statements.

■■■ **2. Discussion.** The circuit court ruled that Ms. Osborne's statements were admissible because they were not hearsay [13] under evidentiary Rule 801(d)(2)(E), which provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

With regard to Rule 801(d)(2), this Court has explained:

> According to *State v. Fairchild,* 171 W.Va. 137, 144, 298 S.E.2d 110, 117 (1982), "evidence of acts or declarations of co-conspirators or co-actors is admissible only if a proper foundation, or prima facie case, is established.... The required foundation consists of: (1) proof of a conspiracy existing between the declarant and the defendant; and (2) proof that the act or declaration was made during and in pursuance of the conspiracy or joint enterprise. (Citation omitted.)" *See Bourjaily v. U.S.,* 483 U.S. 171, 176–81, 107 S.Ct. 2775, 2779–82, 97 L.Ed.2d 144, 153–56 (1987) (holding the Fed.R.Evid. 801(d)(2)(E) requires proof of the conspiracy by a preponderance of the evidence and allows consideration of the offered declaration as part of the proof of the conspiracy); *State v. Nixon,* 178 W.Va. 338, [342], 359 S.E.2d 566, 570 (1987).

*State v. Miller,* 195 W.Va. 656, 666, 466 S.E.2d 507, 517 (1995).[14]

Insofar as we have already determined, in Section III.B.3 of this opinion, that the evidence presented at trial was sufficient to establish the existence of a conspiracy, in addressing this issue, we need only consider whether the statements at issue were "made during and in pursuance of the conspiracy or joint enterprise." *Miller,* 195 W.Va. at 666, 466 S.E.2d at 517.

■■■ It has been explained that "[t]he 'usual rule' for determining what behavior

separate statements to police officers on the night of the murder. In both statements, Ms. Osborne indicated that the assailant had been a stranger.

**13.** Pursuant to Rule 801(c) of the West Virginia Rules of Evidence, " '[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Furthermore, under the hearsay rule, "[h]earsay is not admissible except as provided by [the West Virginia Rules of Evidence]." W. Va. R. Evid. 802. In other words,

> generally, out-of-court statements made by someone other than the declarant while testifying are not admissible unless: 1) the statement is not being offered for the truth of the matter

asserted, but for some other purpose such as motive, intent, state-of-mind, identification or reasonableness of the party's action; 2) the statement is not hearsay under the rules; or 3) the statement is hearsay but falls within an exception provided for in the rules.

Syl. pt. 1, *State v. Maynard,* 183 W.Va. 1, 393 S.E.2d 221 (1990).

**14.** The *Miller* Court clarified further that,

> [b]ecause *State v. Fairchild* was decided before the codification of the W. Va. R. Evid., we find it is not dispositive of any evidentiary issue embraced within the Rules. However, since its holding is not contrary to Rule 801(d), we find that *State v. Fairchild* remains as a 'source of guidance.' *Reed v. Wimmer,* 195 W.Va. 199, 465 S.E.2d 199 (1995).

was 'during the course' of the conspiracy is whether the behavior 'was made while the plan was in existence and before its complete execution or termination.'" *State v. Helmick*, 201 W.Va. 163, 170, 495 S.E.2d 262, 269 (1997) (quoting *State v. Yslas*, 139 Ariz. 60, 63, 676 P.2d 1118, 1121 (1984) (additional citations omitted)). Significantly, however, this Court has clarified that,

> "[u]nder Rule 801(d)(2)(E) of the West Virginia Rules of Evidence, a declaration of a conspirator, made subsequent to the actual commission of the crime, may be admissible against any co-conspirator if it was made while the conspirators were still concerned with the concealment of their criminal conduct or their identity." Syllabus Point 3, *State v. Helmick*, 201 W.Va. 163, 495 S.E.2d 262 (1997).

Syl. pt. 6, *State v. Ramsey*, 209 W.Va. 248, 250, 545 S.E.2d 853, 855 (2000). Upon our review of the evidence, we agree with the circuit court's conclusion that the herein challenged statements by Ms. Osborne[15] were made in the furtherance of the conspiracy insofar as they were made to conceal the roles of Ms. Osborne and Mr. White in the murder of Mr. Mahrous. Accordingly, we find no abuse of discretion in the trial court's rulings admitting Ms. Osborne's statements under Rule 801(d)(2)(E) of the West Virginia Rules of Evidence.

### D. Lawfulness of Search

Mr. White next contends that the trial court erred in admitting evidence that was the fruit of an unlawful search of a cellular telephone he owned. The State responds that the contents of the telephone were recoverable under the legal search, by warrant, that led to the recovery of the telephone itself.

**1. Factual Background.** We first set out the relevant facts pertaining to this issue.

On the night of her husband's murder, Ms. Osborne drove to meet him at Riverfront Park in Ravenswood, West Virginia, in a yellow Ford truck that was titled in the name of her husband, the decedent Mr. Mahrous. Following Mr. Mahrous's murder at Riverfront Park, during the early stages of the police investigation, the truck was transported to the city maintenance garage, and a search warrant was obtained to search the truck for "evidence of a crime." The warrant authorized the State to seize "any personal property ... belonging to [Mr. Mahrous] or his wife Roseann Osborne." During the course of the search of the truck, a Motorola cellular telephone was seized.[16] The contents of the telephone were searched and produced evidence that led investigators to Mr. White, and provided a foundation for additional search warrants for Mr. White's cellular telephone account information and cellular telephone tower information. Mr. White's cellular telephone account information, in turn, revealed the numerous communications between Ms. Osborne and Mr. White on the day of Mr. Mahrous' murder.[17] The cellular tower information provided Mr. White's general location around the time of Mr. Mahrous' murder, *i.e.* that he was in the Ravenswood area.[18]

**2. Standard of Review.** Mr. White sought the exclusion of the cellular telephone records and cellular tower information via a pre-trial motion to suppress, which was denied by the trial court. We have established the following standard for our review of a trial court's ruling on a motion to suppress:

> When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific

*State v. Miller*, 195 W.Va. 656, 666 n. 7, 466 S.E.2d 507, 517 n. 7 (1995).

**15.** See *supra* note 12 for a summary of Ms. Osborne's statements.

**16.** It was later learned that the cellular telephone was owned by Mr. White, but was being used by Ms. Osborne. See note 20, *infra,* for additional comments about the ownership of the Motorola cellular telephone.

**17.** Particularly the fact that there had been fifty-nine calls between Mr. White and Ms. Osborne, and seven of those calls had occurred close in time to the murder. See note 10, *supra.*

**18.** Although Mr. White initially told investigators that he had been in Indiana at the time of the murder, the telephone tower records established that he had, in fact, been in the Ravenswood area.

nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

Syl. pt. 1, *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996). *See also* Syl. pt. 3, *State v. Stuart*, 192 W.Va. 428, 452 S.E.2d 886 (1994) ("On appeal, legal conclusions made with regard to suppression determinations are reviewed de novo. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. In addition, factual findings based, at least in part, on determinations of witness credibility are accorded great deference."). We will apply the foregoing standards to our resolution of this issue.

■ **3. Discussion.** Mr. White contends that, once the cellular telephone was seized, a separate search warrant was required in order to lawfully search its contents. Because no such warrant was obtained, Mr. White argues that all of the evidence flowing from the search of the contents of the Motorola cellular telephone should have been suppressed as fruit of an unlawful search.

In support of his argument that a separate warrant was required to authorize a search of the contents of the cellular telephone, Mr. White cites numerous cases involving telephones that were seized *without a warrant.*[19] Those cases simply are not applicable to the instant matter, because the Motorola cellular telephone at issue was seized in the execution of a valid search warrant.[20] Instead, the question that must be answered to resolve

this issue is whether a separate search warrant is required to examine the contents of items seized in the execution of a valid search warrant. The United States Supreme Court touched on this issue in the case of *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). In *Ross*, the Supreme Court explained that

[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. A warrant to open a footlocker to search for marihuana would also authorize the opening of packages found inside. A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search. When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.

456 U.S. at 820–21, 102 S.Ct. at 2170–71, 72 L.Ed.2d 572 (footnotes omitted). This Court previously has indicated its approval of *Ross*, which was quoted in *State v. Lacy*, 196 W.Va. 104, 116, 468 S.E.2d 719, 731 (1996). Fur-

---

**19.** Mr. White acknowledges that there is a split of authority regarding whether a warrant is required to search the contents of a cellular telephone that is seized *without a warrant*. However, we need not discuss this authority insofar as the cellular telephone in the instant case was seized pursuant to a valid search warrant.

**20.** As noted above, law enforcement officers obtained a warrant to search the Ford truck to search for "evidence of a crime," and to seize "any personal property ... belonging to [Mr. Mahrous] or his wife Roseann Osborne." We are not troubled by the fact that it was later learned that the cellular telephone at issue was

actually owned by Mr. White. At the time of the search, the cellular telephone was located in a truck that was owned by Mr. Mahrous and had been last under the control of his wife, Ms. Osborne. Thus, it was objectively reasonable for the law enforcement officers conducting the search to conclude that all personal property located inside the truck was owned by Mr. Mahrous or his wife, Ms. Osborne. Furthermore, we note that Mr. White has not argued that the telephone was not properly seized pursuant to the search warrant. Instead, Mr. White argues only that an additional warrant was required to search the telephone's contents.

thermore, it has been observed generally that an additional warrant is not required to examine seized objects. *See* 2 Wayne R. LaFave, *Search and Seizure*, § 4.10(e) at 771 (4th ed.2004) (observing that "[p]erhaps because it is generally understood that a lawful seizure of apparent evidence of crime pursuant to a search warrant carries with it a right to test or otherwise examine the seized materials to ascertain or enhance their evidentiary value, this issue is rarely litigated" (footnote omitted)). *Cf. Commonwealth v. Copenhefer*, 526 Pa. 555, 562, 587 A.2d 1353, 1356 (1991) ("A paper tablet, seized pursuant to a valid search warrant, may be subjected to scientific and physical manipulation and analysis without a second search warrant. . . . The same would be true of a diary recorded in a private code. If we accepted appellant's argument, after seizing the diary pursuant to a valid search warrant, the state would be obligated to obtain a second warrant before it could attempt to read the diary by deciphering the code. Yet the diarist's obvious attempt to achieve secrecy does not create a legally protected expectation of privacy nor the need to obtain a warrant before subjecting legally seized physical evidence to scientific testing and analysis to make it divulge its secrets."), *abrogated in part on other grounds by Commonwealth v. Rizzuto*, 566 Pa. 40, 777 A.2d 1069 (2001); *State v. Gregory*, 158 Wash.2d 759, 826, 147 P.3d 1201, 1236 (2006) (observing that "once a suspect's property is lawfully in the State's control, the State may perform forensic tests and use the resulting information to further unrelated criminal investigations, without violating the owner's Fourth Amendment rights" (citing *State v. Cheatam*, 150 Wash.2d 626, 638, 81 P.3d 830 (2003))).

■ Accordingly, we now expressly hold that, when searching a vehicle pursuant to a valid search warrant, no additional search warrant is required to examine the contents of items that are properly seized in the execution of the warrant, including, but not limited to, cellular telephones. Applying this holding to the case at hand, we find the contents of the Motorola cellular telephone seized from Mr. Mahrous's yellow truck were properly examined by law enforcement officials. Therefore, the trial court did not err

in denying Mr. White's motion to suppress evidence that was obtained as a result of that examination.

### E. Post–Trial Disclosure

Mr. White finally argues that the trial court erred in failing to grant his "Amended Renewed Motion for New Trial," which was filed in light of post-trial disclosures to Mr. White of material that he contends should have been disclosed prior to trial pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ **1. Standard of Review.** This Court has recently established that

[a] claim of a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), presents mixed questions of law and fact. Consequently, the circuit court's factual findings should be reviewed under a clearly erroneous standard, and questions of law are subject to a *de novo* review.

Syl. pt. 7, *State v. Black*, 227 W.Va. 297, 708 S.E.2d 491 (2010).

■ **2. Discussion.** Mr. White complains that, following his trial, and prior to the trial of his co-defendant Ms. Osborne, the State disclosed to him certain records from the State of North Carolina involving domestic violence petitions against the victim, Mr. Mahrous. In addition, Mr. White complains that the State failed to disclose to him a video taken from a surveillance camera of the Ravenswood Specialty Metals Plant, which is in close proximity to the scene of the crime.

■ This Court has observed that

[t]here are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either wilfully or inadvertently; and (3) the evidence must have been material, *i.e.*, it must have prejudiced the defense at trial.

Syl. pt. 2, *State v. Youngblood*, 221 W.Va. 20, 650 S.E.2d 119 (2007). While Mr. White's brief makes several conclusory statements with respect to this assignment of error, none of the arguments are sufficiently developed to demonstrate how this evidence was material. In this regard, we repeatedly have admonished appellants that " '[a] skeletal "argument," really nothing more than an assertion, does not preserve a claim. . . .' " *State, Dep't of Health & Human Res. v. Robert Morris N.*, 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995) (citation omitted). *See also Farmer v. Knight*, 207 W.Va. 716, 722, 536 S.E.2d 140, 146 (2000) (per curiam) (" 'It is . . . well settled . . . that casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal.' " (quoting *State v. Lilly*, 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995))); *Albright v. White*, 202 W.Va. 292, 298 n. 9, 503 S.E.2d 860, 866 n. 9 (1998) (declining to address issues on appeal that had not been adequately briefed).

Nevertheless, we note that, as the trial court observed, the State did not possess the North Carolina domestic violence records until February 2009,[21] which was after the conclusion of Mr. White's trial.[22] Therefore, *Brady v. Maryland* did not apply to the domestic violence records.[23] With respect to the surveillance video, the trial court observed that the video was in the possession of the State prior to Mr. White's trial, but concluded that the State had not suppressed the video, because the video had been mentioned in the State's discovery packet. Moreover, the trial court concluded that the video did not have material value in that Mr. White had confessed to killing Mr. Mahrous, and there was no dispute that he was present at Riverfront Park at the time of the killing.

Finally, the court observed the exceedingly poor quality of the video, and concluded that it had no evidentiary value insofar as you could not identify any individuals or recognize any vehicles depicted in the video. For these reasons, we find no error in the trial court's denial of Mr. White's "Amended Renewed Motion for New Trial" based on alleged *Brady* violations.[24]

## IV.

## CONCLUSION

For the reasons set out above, we affirm the judgment finding Mr. White guilty of one count of first-degree murder and one count of conspiracy to commit a felony, and sentencing him to life with mercy for the first-degree murder conviction, and a consecutive sentence of one to five years for the conspiracy.

Affirmed.

Judge ALSOP concurs and reserves the right to file a concurring opinion.

Justice McHUGH, deeming himself disqualified, did not participate in the decision of this matter.

Judge ALSOP, sitting by temporary assignment.

ALSOP, J., concurring in part and dissenting in part.

(Filed Aug. 18, 2011)

I concur with the result reached in the majority opinion insofar as it recognizes that the evidence obtained from the search of the Motorola cellular telephone, found in Mr. Mahrous's truck, was properly admitted and

---

**21.** The jury returned its verdict in Mr. White's case on December 20, 2008. The trial court denied Mr. White's motion for a new trial on December 22, 2008, and the order sentencing Mr. White was entered on January 2, 2009.

**22.** We find nothing in the record of this case to indicate that the State had any reason to know of the North Carolina records prior to Mr. White's trial.

**23.** We wish to make clear that, even if the State had possessed the evidence of the North Carolina domestic violence records pertaining to the vic-

tim prior to Mr. White's trial and had disclosed the same, there is no guarantee that such evidence would have been admissible. *See, e.g., State v. Gray*, 217 W.Va. 591, 600, 619 S.E.2d 104, 113 (2005) (per curiam) ("Considering the facts of this case, however, the evidence concerning the victim's general reputation was not relevant as admissible evidence.").

**24.** Because we have found no error in this case, we decline to address Mr. White's claim of cumulative error.

the trial court did not err in its motion to suppress said evidence. However, I dissent with the majority opinion as to its reasoning that the evidence was properly admitted. The majority opinion declares the evidence was properly obtained pursuant to the search warrant issued in this case, and fails to address the issue of whether Mr. White even had standing to challenge the search and seizure of the Motorola cellular telephone found in the vehicle. I believe the lack of standing on the part of Mr. White to challenge the search of the subject vehicle is the critical issue, rather than the sufficiency and validity of the search warrant. If Mr. White lacked legal standing to challenge the search, then the analysis stops there.

In the instant matter Mr. White did not have standing to challenge the search of the Motorola cellular telephone as he waived any expectation of privacy to said property when he, as the non-vehicle owner, left the cellular telephone in the yellow truck belonging to Mr. Mahrous. Additionally, in light of the evidence in the record that there were no identifying indicators of ownership on the Motorola cellular telephone and it was not password protected. The United States Supreme Court held in *Illinois v. Andreas* that "an act is not a search unless it intrudes upon a legitimate expectation of privacy." 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). "In order to obtain standing a party must show that the search and seizure violated his personal Fourth Amendment right to a legitimate expectation of privacy in the particular area searched. Ownership or possession of an item seized is insufficient in itself to establish a right to a legitimate expectation of privacy in the particular area searched. A legitimate expectation of privacy depends upon two factors: whether the defendant has manifested a subjective expectation of privacy in the particular areas searched and whether society is prepared to recognize this expectation of privacy as objectively reasonable." *U.S. v. Burney*, 937 F.2d 603 (4th Cir.1991); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). "The burden of establishing these factors is on the defendant." *Rakas*, 439

U.S. at 134, 99 S.Ct. 421. Further, the Court in *Burney* found the "[f]actors relevant to the determination of the defendant's subjective expectation of privacy in the particular area searched include ownership of the items seized, evidence of the defendant's desire to keep the items seized private, and the defendant's presence or absence at the time of the search." *U.S. v. Burney*, 937 F.2d 603.

This Court recognized in *State v. Calandros* that a defendant has no right to object to a search and seizure where his right of privacy was not violated and his constitutional rights were not affected in that the premises searched and the property seized were in the possession of a third person. 140 W.Va. 720, 86 S.E.2d 242 (1955).

In this case, Mr. White is claiming the evidence obtained from the Motorola cellular telephone belonging to Mr. White, which had no indication of ownership and was not password protected, and was found in the yellow truck, belonging to Mr. Mahrous, was wrongly admitted as the search of the Motorola telephone was unlawful. A claim of protection under the Fourth Amendment and the right to challenge the legality of a search depends not upon person's property right in the invaded place or article of personal property, but upon whether a person has a legitimate expectation of privacy in the invaded place or thing; if a person is in such a position that he cannot reasonably expect privacy, the court may find that an unreasonable Fourth Amendment search has not taken place. *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, 583 (1967); *Wagner v. Hedrick*, 181 W.Va. 482 at 487, 383 S.E.2d 286 at 291 (1989). In *Arizona v. Gant*, the United States Supreme Court recognized that a motorist's privacy interest in his vehicle is less substantial than that of his home; nevertheless, the interest in one's vehicle is important and deserving of constitutional protection. 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009).

In the case at hand, the vehicle in which the Motorola cellular telephone was found belonged to Mr. Mahrous, not Mr. White.[1]

---

1. The defendant lacks standing to challenge the search of Mr. Mahrous's vehicle. Under *Rawl-*

*ings v. Kentucky* a defendant bears the burden of demonstrating that they had a legitimate expec-

As such, the holding in *Gant* is not applicable as Mr. White was not the owner of the vehicle searched and therefore, is not entitled to any constitutional protections with regard to expectation of privacy. Further, as previously stated, the relevant factors used to determine a defendant's subjective expectation of privacy in a particular area searched include ownership of the items seized, evidence of the defendant's desire to keep the items seized private, and the defendant's presence or absence at the time of the search. *U.S. v. Burney*, 937 F.2d 603. The trial court in its order denying the motion to suppress, found that Mr. White lacked standing and the trial court was absolutely correct.

I am fearful that the majority opinion goes too far and addresses a developing area of constitutional law that would be best left for another day. First, the majority opinion purports to grant legal standing to challenge the validity of a search, when clearly Mr. White lacked such standing. Secondly, the majority opinion in this case has adopted a very broad new syllabus point, to wit: syllabus point 14, which states:

> "When searching a vehicle pursuant to a valid search warrant, no additional search warrant is required to examine the contents of items that are properly seized in the execution of the warrant, including, but not limited to, cellular telephones",

without citing any authority for such proposition of law.

I am of the opinion this broad language may be ill advised. As written, syllabus point 14 would justify a search of the cell phone simply because it was in the vehicle that was searched pursuant to a search warrant. This syllabus point, as written, can be broadly interpreted and will present challenges in the future. This area of law, as to search and seizure of electronic devices, continues to develop under the United States Constitution. For example, what if the cell phone was clearly identified as not being the property of Mr. Mahrous and was password protected. This syllabus point, as written, would authorize such a search and seizure.

The above syllabus point would justify such a search even when the lawful owner had taken action to protect his privacy, such as by implementing a pass code protection on his or her cellular phone. In this evolving area of searches of computers, iPhones, smart phones, and other electronic devices, such evaluation would be better addressed on another day.

I acknowledge there is nothing to prevent this Court from creating new laws under the West Virginia Constitution. However, the syllabus point above is extremely broad, and may not be constitutionally permissible under the Fourth Amendment of the Constitution of the United States. Provisions of the state constitution may not however provide a lower standard of protection than that afforded by the federal constitution. *Adkins v. Leverette*, 161 W.Va. 14, 239 S.E.2d 496 (1977) (Specifically holding "[w]hile it is true that state may not interpret its constitutional guarantee which is identical to federal constitutional guarantee below federal level[.]")

Accordingly, I respectfully concur in part and dissent in part.

tation of privacy in the objects searched and/or seized. 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *United States v. Givens*, 733 F.2d 339 (4th Cir.1984); *United States v. Bellina*, 665 F.2d 1335, 1340 (4th Cir.1981). Further it was found in *United States v. Mehra*,

that items placed in property belonging to others create no reasonable expectation of privacy. 824 F.2d 297 (4th Cir.1987).