# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Larry S. White II,**
**Petitioner Below, Petitioner**

**vs) No. 14-1272** (Jackson County 11-C-29)

**Marvin Plumley, Warden,**
**Huttonsville Correctional Center,**
**Respondent Below, Respondent**

**FILED**

November 23, 2015
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Larry S. White II, by counsel Shawn D. Bayliss, appeals the Circuit Court of Jackson County's October 28, 2014, order denying his petition for writ of habeas corpus. Respondent Marvin Plumley, Warden, by counsel Benjamin F. Yancey III, filed a response. On appeal, petitioner alleges that the circuit court erred in denying his habeas petition because he established that he was entitled to relief based upon the State's suppression of exculpatory evidence, the State's use of illegally obtained evidence, and that he was denied the right to effective assistance of counsel.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In February of 2008, petitioner and his co-defendant were each indicted on one count of first-degree murder and one count of conspiracy to commit first-degree murder for the death of Mohamed Mahmoud A. Mahrous ("the victim").[1] Following trial, the jury found petitioner guilty of both felonies and recommended mercy for the murder charge. Thereafter, in December of 2008, petitioner filed a motion for new a trial which was denied by the circuit court. The circuit court then sentenced petitioner to life with mercy for the charge of first-degree murder, and a term of not less than one year nor more than five years for the conspiracy charge. The two sentences were ordered to be served consecutively.

In July of 2009, petitioner filed an "Amended Renewed Motion for New Trial" alleging that the State failed to disclose court records from North Carolina that documented the issuance of domestic violence protective orders against the victim concerning petitioner's co-defendant, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *State v. Youngblood*, 221 W.Va. 20, 650

---

[1]This victim was the co-defendant's husband.

S.E.2d 119 (2007). Several days later the circuit court held a hearing on petitioner's motion and denied petitioner relief.

In February of 2010, petitioner filed a direct appeal with this Court asserting that the circuit court committed the following errors: (1) failing to grant his motions to strike two prospective jurors; (2) convicting him upon insufficient evidence; (3) admitting evidence that was the fruit of an unlawful search of a cellular telephone; (4) admitting certain out-of-court statements under Rule 801(d)(2)(E) of the West Virginia Rules of Evidence; and (5) refusing to grant his "Amended Renewed Motion for New Trial" based upon alleged violations of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This Court held oral argument on January 12, 2011, pursuant to Rule 20 of the Rules of Appellate Procedure. By order submitted February 10, 2011, this Court affirmed the judgment finding petitioner guilty of one count of first-degree murder and one count of conspiracy to commit a felony, and sentencing him to life with mercy for the first-degree murder conviction, and a consecutive sentence of one to five years for the conspiracy. *See State v. White*, 227 W.Va. 231, 707 S.E.2d 841 (2011) (Davis, J.), republished as, *State v. White*, 228 W.Va. 530, 722 S.E.2d 566 (2011).

In March of 2011, petitioner, pro se, filed his first petition for writ of habeas corpus in circuit court. Thereafter in January of 2014, the circuit court appointed petitioner counsel and filed an amended petition for writ of habeas corpus alleging the following grounds for relief: 1) ineffective assistance of counsel; 2) pre-trial publicity; 3) consecutive sentences; 4) coerced confession; 5) suppression of helpful evidence by the prosecutor (*Brady* violation); 6) challenges to the composition or procedure of the grand jury; 7) refusal to subpoena witnesses (ineffective counsel); 8) evidentiary rulings regarding his renewed motion for a new trial; 9) prejudicial statements by the trial judge; 10) prejudicial statements by the prosecutor; 11) sufficiency of the evidence; 12) more severe sentence than expected; 13) excessive sentence; 14) impaired counsel (ineffective counsel); and 15) rate of compensation for counsel. In August of 2014, petitioner filed a motion to continue and a motion for leave to amend his amended petition for writ of habeas corpus asserting that *Riley v. California*, 134 S.Ct. 2473 (2014), may apply to his case.[2] The circuit court then held an omnibus evidentiary hearing, after which it denied petitioner habeas relief. It is from this order that petitioner appeals.

This Court reviews appeals of circuit court orders denying habeas corpus relief under the following standard:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009).

---

[2]The circuit court noted in its final order that it did not formally rule on petitioner's motion, but directed the parties to address the issues raised in *Riley* in the proposed orders.

On appeal to this Court, petitioner reasserts his claims that the circuit court erred in denying him habeas relief based on the State's suppression of exculpatory evidence, in violation of *Brady* and *Youngblood*; that the circuit court further erred in allowing the State's use of illegally obtained evidence, in violation of *Riley*; and that he was denied the right to the effective assistance of counsel. The Court, however, does not agree. Upon our review and consideration of the circuit court's order, the parties' arguments, and the record submitted on appeal, we find no error or abuse of discretion by the circuit court. Our review of the record supports the circuit court's decision to deny petitioner post-conviction habeas corpus relief based on these alleged errors, which were also argued below. Indeed, the circuit court's forty-five paged order includes well-reasoned findings and conclusions as to the assignments of error raised on appeal. Given our conclusion that the circuit court's order and the record before us reflect no clear error or abuse of discretion, we hereby adopt and incorporate the circuit court's findings and conclusions as they relate to petitioner's assignments of error raised herein and direct the Clerk to attach a copy of the circuit court's October 28, 2014, "Judgment Order" to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** November 23, 2015

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Menis E. Ketchum
Justice Allen H. Loughry II

IN THE CIRCUIT COURT OF JACKSON COUNTY, WEST VIRGINIA:

STATE OF WEST VIRGINIA *ex rel.*
LARRY S. WHITE, II

      Petitioner,

vs.                      // 

ADRIAN HOKE, Warden,

      Respondent.

Habeas Corpus
Case No. 11-C-29
(Judge Thomas C. Evans, III)

## JUDGMENT ORDER

On August 14, 2014, came the Petitioner, Larry S. White, II, appearing by live video/teleconference, and by counsel, Shawn D. Bayliss; and, came also the Respondent by counsel, Katherine H. Casto, Assistant Prosecuting Attorney, in and for this County and this State, for evidentiary hearing on the within Petition for a Writ of Habeas Corpus *ad subjiciendum.*

The parties were each afforded an opportunity to present evidence and argument via proposed findings of fact and conclusions of law.

### Introductory Statement[1]

After dark on or about September 17, 2007, Mohamed Mahmoud A. Mahrous met his wife, Roseanne Osborne, at the Riverfront Park in Ravenswood,

---

[1] The Court takes judicial notice of all motions, hearings, transcripts, and orders generated in Jackson County Circuit Court case number 08-F-10.

1

West Virginia, for dinner.[2]  The victim and Ms. Osborne, his wife, were seated at a picnic table at the park.  Larry S. White, II, the Petitioner herein and Defendant below, by prior arrangement with the wife of Mahrous was "lying in wait" and approached Mr. Mahrous from behind.  Without warning, Petitioner struck Mr. Mahrous multiple times in the back of the head with a 3 lb. hammer, killing Mr. Mahrous.

Petitioner then disposed of the murder weapon by throwing it in the Ohio River, from which it was later recovered by law enforcement.

Although Ms. Osborne, the victim's wife, told the police that the perpetrator was unknown to her, Ms. Osborne had had a long-standing affair with the Petitioner, and such affair resulted in a child.

Within the weeks prior to Mr. Mahrous's death, he and his wife, Ms. Osborne, attempted to reconcile, living together for the first time in several months.

The investigation by police eventually turned to the Petitioner and Ms. Osborne.  Such evidence included cell phone records, which placed Petitioner in the Ravenswood, W. Va. at the time of the crime,  which was in conflict with Petitioner's statement that he had been in Indiana working at the time, together

---

[2] After the victim, Mr. Mahrous, got off work from a restaurant in nearby Ripley, West Virginia, Mr. Mahrous and Ms. Osborne went through a local drive-thru to get fast food.  The couple then went to the park, driving separate vehicles.

2

with a Mirandized statement by the Petitioner, which included a confession to striking Mr. Mahrous in the head with the hammer.

## PROCEDURAL HISTORY

1.     The Petitioner herein and Defendant below was indicted in *State of West Virginia v. Larry S. White, II*, Jackson County Circuit Court case number 08-F-10, with one count of "First Degree Murder," in violation of West Virginia Code, § 61-2-1, and one count of "Conspiracy to Commit a Felony," in violation of West Virginia Code, § 61-10-31. The named victim in both counts is Mohamed Mahmoud A. Mahrous. The Petitioner's named co-defendant is Roseann Osborne, wife of the victim Mahrous.

2.     On December 16, 2008, a jury trial on the indictment was held in Jackson County Circuit Court. The Defendant was therein represented by Matthew Clark, Esquire, Kayser Layne & Clark, PLLC, and Jeremy Vickers, Esquire. At trial, the Petitioner presented a "diminished capacity" defense, claiming that he killed Mr. Mahrous as a result of delusional thinking.

3.     On December 20, 2008, at the conclusion of the trial, the jury returned a verdict of "guilty" on both counts in the indictment. The jury recommended that the Petitioner receive mercy for the "First Degree Murder" charge.

4.     On December 22, 2008, the Petitioner's motion for a new trial was denied. The Court did then proceed to sentence the Petitioner as follows: for the

3

offense of "First Degree Murder," the Petitioner was committed to the custody of the Commissioner of the West Virginia Department of Corrections for confinement in the penitentiary for **life with mercy**; and for the offense of "Conspiracy to Commit a Felony", the Petitioner was committed to the custody of the Commissioner of the West Virginia Department of Corrections for confinement in the penitentiary for **not less than one year nor more than five years**. The Court ordered these sentences to run **consecutively**. The Petitioner was granted credit for time served in connection with this case.

5. On February 5, 2010, the Petitioner filed a Petition to the West Virginia Supreme Court of Appeals. The appeal was thereafter accepted, and was decided on February 10, 2011, in *State of West Virginia v. Larry S. White, II*, 227 W.Va. 231, 707 S.E.2d 841 (2011). In the appeal, the Petitioner cited five errors:

(a) failed to grant the Petitioner's motions to strike two prospective jurors, Michelle Lemon and Cassia Scott;

(b) evidence insufficient to support conviction;

(c) error in admitting evidence from fruit of an unlawful search of a cell phone, including an incriminating statement of the Petitioner;

(d) error in admitting out-of-court statements pursuant to Rule 801(d)(2)(E) of the West Virginia Rules of Evidence; and

4

(e) error in denial of the "Amended Renewed Motion for new Trial," based upon alleged violations of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *State v. White*, 228 W.Va. 530, 535. After addressing each of the Petitioner's five errors, the W. Va. Supreme Court of Appeals upheld the lower court's rulings, and affirmed the conviction.

6. On or about January 20, 2014, the Petitioner filed *Petitioner's Amended Petition for Writ of Habeas Corpus* (hereinafter, referred to as "*Petition*"). In his *Petition*, the Petitioner set forth fifteen claims for granting his writ of *habeas corpus*.

7. On or about the 7th day of August, 2014, the Petitioner filed a *Motion to Continue and Motion for Leave to Amended Petition for Writ of Habeas Corpus*. The Petitioner stated that the recent United State Supreme Court ruling in *Riley v. California*, 134 S.Ct. 2473, 189 L.Ed.2d 430, 82 USLW 4558 (2014), may have a bearing on the case at hand, specifically in regards to the search of the Petitioner's cell phone. Although the Court did not formally rule on the Petitioner's motion for leave to amend the petition, the Court did instruct the parties to address the issues raised in *Riley* in their respective *Proposed Orders*.

The Court will address each of the Petitioner's fifteen original claims, as well as the issues raised in *Riley v. California*, in turn:

5

# FINDINGS OF FACT & CONCLUSIONS OF LAW

## I. FIRST CLAIM: INEFFECTIVE ASSISTANCE OF COUNSEL

A. <u>Petitioner's Claim</u> – In his first claim, the Petitioner alleges that he received ineffective assistance of counsel. Primarily, the Petitioner claims that: (1) trial counsel failed to adequately investigate the case; (2) trial counsel failed to introduce court records from North Carolina "that went to the heart of the defense herein;" and (3) trial counsel failed to call pertinent witnesses to testify at trial.[3]

B. <u>Applicable Law</u> – The controlling test for determining whether a defendant has received ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984), and in West Virginia's adoption of the *Strickland* test in *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

> 5. In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.
>
> 6. In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of

---

[3] Petitioner also alleged ineffective assistance of counsel due to the allegation that Mr. Vickers was impaired by drugs and/or alcohol during his representation of the Petitioner. Because this claim is also brought under the Fourteenth Claim of the Petition, this issue will be addressed in Subsection XIV, *infra*.

6

all circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

Syllabus Point 5 and Syllabus Point 6, *State v. Miller*, 194 W.Va. 3 (1995).

> 5. In deciding ineffective of assistance claims, a court need not address both prongs of the conjunctive standard of *Strickland v. Washington*[,] and *State v. Miller*[,] but may dispose of such a claim based solely on a petitioner's failure to meet *either prong of the test.*

Syllabus Point 5, *State ex rel. Daniel v. Legursky*, 195 W.Va. 314 (1995).

[Emphasis added.]

C.  Relevant Facts – At trial, counsel offered an affirmative defense of diminished capacity, based upon expert testimony that the Petitioner suffered from persecutory-type delusions, and was thus delusional at the time of the murder. To illustrate this point, trial counsel put substantial emphasis on the Petitioner's belief that Mr. Mahrous was a violent predator who physically and sexually abused Ms. Osborne and Ms. Osborne's children, despite there being no evidence that Mr. Mahrous was anything other than a "good guy."

To this end, trial counsel questioned the investigating officers -- then-Lieutenant A. J. Boggs and then-Patrolman G. C. Burnem of the Jackson County

7

Sheriff's Department – about whether their investigation had yielded any evidence to support the Petitioner's belief that Mr. Mahrous was violent, to which both men replied that it had not.

Further, much of Petitioner's case rested on the expert testimony of Dr. Timothy Saar, who testified that the Petitioner "elevated [Mr. Mahrous] to such an evil level that he felt the hammer was his best protection." *Trial Transcript: Volume IV*, pg. 72, lines 14-19. In coming to his conclusion that the Petitioner's "thinking was so convoluted," *Id.*, pg. 73, lines 20-21, Dr. Saar cited a lack of evidence to support the Petitioner's claims that Mr. Mahrous sexually assaulted Ms. Osborne. *Id.*, pg. 70. Dr. Saar's opinion was based on the evidence that the Petitioner was so deluded in believing that Mr. Mahrous was violent, that he honestly believed that he was killing Mr. Mahrous in order to protect Ms. Osborne.

D. <u>Analysis & Conclusions</u> – The Petitioner's first claim rests almost entirely on trial counsel's failure to present evidence to support that Mr. Mahrous was, in fact, "evil." The Petitioner alleges that counsel was ineffective for not investigating the case adequately, for not obtaining relevant documents from North Carolina[4], for not calling then-Victim Advocate Melissa Wilkinson to testify regarding a domestic violence protective order against Mr. Mahrous, on Ms. Osborne's behalf, for not calling witnesses to testify about charges or protective

---

[4] Addressed in further detail in subsection V, *infra*.

8

orders in North Carolina, and for not calling witnesses to testify in regards to other investigations for which Mr. Mahrous was the subject, including a shoplifting charge, a drug charge, and an immigration issue.

At the evidentiary hearing on the *Petition*, the Petitioner claimed that Mr. Vickers had promised the Petitioner that he would hire a private investigator and medical examiner to investigate the case, although Mr. Clark was clear that an investigator was not warranted given the facts of the case.

> **BAYLISS:** As far as wanting a private medical examiner, did you speak about that with Mr. Clark as well as Mr. Vickers?
>
> **WHITE:** Well, I just spoke about it with Mr. Vickers, because Mr. Vickers brought it to my attention. And I assumed that being as Mr. Vickers and Mr. Clark was working together, that whatever was said to Mr. Vickers would [be] relayed to Mr. Clark.
>
> **BAYLISS:** And did you talk to Mr. Clark directly about hiring a private investigator?
>
> **WHITE:** Yes.

*Evidentiary Hearing Transcript*, pg. 43, lines 14-24.[5]

> **BAYLISS:** And again, in this matter, you determined that you didn't believe an investigator was necessary.

---

[5] Pursuant to Rule 609(a)(2) of the West Virginia Rules of Evidence, the credibility of a witness – other than a criminal defendant – can be attacked by virtue of conviction for a crime punishable by imprisonment in excess of one year. The Petitioner, Larry S. White, II, stands convicted of two felonies: "First Degree Murder" and "Conspiracy to Commit a Felony." Such convictions, and the Petitioner's vested interest in prevailing on his *Petition*, is considered by this Court in weighing the Petitioner's credibility.

9

**CLARK:** I did not believe an investigator is necessary; I think that is a fair statement.

**BAYLISS:** And for clarification sake, can you explain why you didn't think one was necessary in the fact scenario we have before us?

**CLARK:** The – number one, there was a confession. The facts were pretty well established. The Sheriff's Department did a good job with the investigation. It was very thorough. There weren't, largely, facts in dispute. I talked to some witnesses; some would not talk to me. I remember it became an issue during the trial, subject to the Court ruling.

I just didn't think there were really any facts that weren't already out there that I didn't find out myself. I just don't – I probable [sic] didn't have an investigator at the time that I felt was reliable, either.

*Evidentiary Hearing Transcript*, pg. 9, lines 3-20.

Despite not hiring a private investigate, trial counsel *did* fully investigate. At the evidentiary hearing, Mr. Clark testified that he spoke with professionals in North Carolina, and obtained records from the same, including the North Carolina domestic violence protection orders, and information that Mr. Mahrous had been charged with shoplifting and a drug charge. *Evidentiary Hearing Transcript*, pg. 10, lines 1-9; pg. 15, lines 14-17; and pg. 29, lines 21-23. Mr. Clark further obtained a letter from Melissa Wilkinson, and subpoenaed Ms. Wilkinson as a possible witness for the trial. *Id.*, pg. 10-11, lines 22-12.

10

Ultimately, the issue was not that trial counsel was unaware of these matters; the issue was that these matters *hurt the defense*, as testified to at the evidentiary hearing by the Petitioner's lead trial counsel, Mr. Clark.

**CLARK:** I don't know specifically why I didn't call [Ms. Wilkinson]. I don't specifically recall that. Based on reviewing her statement, it would appear that my concern would have been that it gave motive to the defendant in calling — from my recollection, Mr. White made various attempts to talk to various officials about Mr. Mahrous. There was something from the IS, he had talk to an Immigration Service agent, I believe. I believe he had talked to a Sergeant Bare here in Jackson County.

And it appeared that he was doing everything he could to get Mr. Mahrous removed from the situation, for whatever reason. My concern was presenting that evidence would have gave motive to the defendant, perhaps greater than he already had, and would lend more credence to the State's theory. I'm sure that is why I didn't call any of those witnesses.

**BAYLISS:** Did you discuss that decision with Mr. White?

**CLARK:** Certainly did.

**BAYLISS:** And was [he] approving or disapproving of that strategy?

**CLARK:** I think he eventually agreed with it. I don't think he agreed with it at the outset, but I talked with him extensively, but I thought our best shot was the diminished capacity. We did not have a present threat of danger, an imminent threat of — you know, clients don't always understand what self-defense or defense of others, what the requirements of those are.

11

And I did not believe that any of this helped him toward that defense. And therefore, I believed the diminished capacity was his best shot for two reasons: One, we may get a lesser degree. This wasn't a case we were going to go in and try and not get a conviction of something.

...The diminished capacity allowed me to get instructions on second degree and involuntary that I may not have gotten.

...Also, the benefit of the diminished capacity was that it allowed me to introduce through my psychologist some of the difficulties Mr. White had throughout his life without him testifying.

And so, it somewhat allowed me to back door in some information that I think had some impact on the jury verdict. I have no way of knowing, but that was my strategy.

*Evidentiary Hearing Transcript*, pg. 12-13, lines 3-24.

CLARK: And certainly, he had some things in his past. He was not a lily-white victim. I did not believe putting the victim on trial would be an effective strategy. I just really don't – I didn't think it got him anywhere.

...But, yeah, I just didn't think the – I think the theory was – and I'm splitting hairs, I know, but Sam believed there was, you know, an imminent threat of violence of some sort, that it was delusional and wasn't borne out by – if anything, that may have been adverse to my theory, these documents may have been.

*Evidentiary Hearing Transcript*, pg. 17, line 17-20; and pg. 18, line 2-7.

CLARK: Sam's position throughout this – Larry Samuel White – was Mohammed [Mahrous] was a really bad guy, a really

12

dangerous guy, and he deserved it. That is not a legal defense. There was no evidence of imminent danger, of self-defense, or protection of others that I could ascertain.

I'm sure I discussed that with Sam in detail. Whether he got it or not, ever, I can't read his mind. But he knew the strategy going in.

*Evidentiary Hearing Transcript*, pg. 19, lines 10-18.

The affirmative defense was that the Petitioner was delusional. The validity — or purported validity — of the Petitioner's complaints against the victim did not mitigate the murder, but rather highlighted the Petitioner's motives to kill him. Trial counsel wisely believed that it would be a better strategy to convince the jury that the Petitioner was a mentally ill man, than to try to convince the jury that the victim deserved to be brutally bludgeoned to death.

At the evidentiary hearing, the Petitioner testified that he wanted to present the "truth" at trial, and denies that the diminished capacity defense was true. *Evidentiary Hearing Transcript*, pg. 40, lines 7-13. The Petitioner testified that Mr. Clark advised him against it. *Id.*, pg. 40, lines 14-23. Although the Petitioner claims that the diminished capacity defense was "the only avenue left open to me," he does admit that he authorized trial counsel to present the defense at trial. *Id.*, pg. 46, lines 17-23.[6]

---

[6] The Petitioner testified that he met with Mr. Clark and Mr. Vickers approximately eight or nine times in advance of trial, and that each visit was approximately an hour in length. *Id.*, pg. 44, lines 6-13.

13

By results, the diminished capacity defense was the right strategy for the case. That the Petitioner received mercy from the Jury in this case is evidence that trial counsel's strategy was not only an objectively reasonable strategy, but was a successful strategy. In a diminished capacity murder case, receiving a verdict of "first degree murder with mercy" or "second degree murder" is considered a "win".[7]

CASTO: Overall, in assessing this trial, do you believe your strategy of diminished capacity was successful?

CLARK: Absolutely.

CASTO: How so?

CLARK: This was a — when I got this case, the first thing was this is a hard case, probably a no-mercy case. Assumed we would have to try the case. The case was never prepared to settle; it was prepared for trial. I told Mr. White the possible verdicts he would receive. I believe I gave him percentages based on just my guess, and I always qualify it.

And second degree would have been nice. I would have considered that a big win if we got second degree. But, with a mercy finding, considering the proof against us, I felt like it worked out pretty well. I believe, you know, no one can speculate on what juries think, why they make their decision but the diminished capacity

---

[7] "[D]iminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but is most likely guilty of a lesser included offense; *thus, a defense claiming diminished capacity contemplates full responsibility*, but only for the crime he or she actually committed." *State v. Joseph*, 214 W.Va. 425, 530 (citing, 21 Am. Jur. Criminal Law §38 at 152). [Emphasis added.]

14

defense let us get in some aspects of Mr. White, some difficulties in his early life through childhood, and even with his first wife.

You know, I thought brought some humanism to Mr. White. I have to [think] in my heart of hearts, I believe that played a role in the verdict. But whether it did, who knows, but that is what I believe.

*Evidentiary Hearing Transcript*, pg. 30, line 7. Pg. 31, line 6

In this case, the defense was able to persuade the jury to give mercy to the Petitioner, despite the Petitioner violently murdering an unarmed, unaware man. Although the Petitioner bemoans that counsel should have put the victim on trial, the fact that the Petitioner will become eligible for parole is objective, concrete proof that the counsel was successful in their representation of him.

By the trial transcript and by Mr. Clark's testimony at the evidentiary hearing, it is clear that trial counsel thoroughly investigated the case, and developed a well-reasoned strategy. Not only did counsel act within the professional guidelines, but they were able to obtain a favorable verdict for their client. There is no evidence that "but for" trial counsel's actions the Petitioner's trial would have been more favorable for the Petitioner; to the contrary, there is objective evidence in the form of the Petitioner's verdict, which suggests that "but for" trial counsel's strategy, the Petitioner would have received a far more detrimental result.

15

The Court finds that there is no merit to the Petitioner's first claim.

## II.    SECOND CLAIM: PRETRIAL PUBLICITY

A.    Petitioner's Claim – In his second claim, the Petitioner alleges that the pretrial publicity in this case was such that is prevented a fair and impartial jury from being convened.

B.    Applicable Law – The issue of pretrial publicity relates to a motion for change of venue. In that regard, the West Virginia Supreme Court has held that to be granted a change of venue due to pretrial publicity, a defendant must show "[a] present hostile sentiment against an accused, extending throughout the entire county in which he is brought to trial." Syl. Pt. 2, *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978). *See also, State v. Johnson*, Unpublished Opinion, 2013 WL 1501432 (2013).

C.    Relevant Facts – During *in camera voir dire*, several jurors indicated that they had not heard any news on the matter, while the other jurors indicated that they had vague recollections of what they had read in the newspapers or seen on television. Snapshot memories of the location of the crime, or the name of the victim, or the instrument of the murder were mentioned, but details were lacking, and in all cases, opinions had not been formed. Further, the jurors relayed that they had, almost entirely, obtained their information in the days or week

16

immediately following the September 2007 murder, and had heard nothing more on the matter since that time.

The Petitioner did not put on any evidence at the hearing, in regards to this claim.

D. Analysis & Conclusions -- Although this case did garner some media coverage, there is nothing to suggest that there was a "hostile sentiment" against the Petitioner at the time of this trial. This is reflective in the *voir dire* of the prospective jurors, for which the jurors could — at most correlate a vague recollection of reading about the murder. Furthermore, each juror assured the Court that he or she would be free from any influence, and assured the Court of his or her ability to set aside any previously-obtained knowledge. These assurances were such that neither the State nor the defense deemed it necessary to challenge the jurors' ability to be impaneled. At no point did trial counsel more for a change of venue due to pretrial publicity.

The Court finds that there is no merit to the Petitioner's second claim.

## III. THIRD CLAIM: CONSECUTIVE SENTENCES

A. Petitioner's Claim — In his third claim, the Petitioner alleges that it was improper to sentence the Petitioner to consecutive sentences for his convictions for "First Degree Murder" and "Conspiracy to Commit a Felony," based on the fact that both charges arose out of the same transaction. In the

17

*Petition*, the Petitioner argues that it is "an unfair and unjust punishment for him to be required to serve additional time for what is essentially the same offense."

B.      Applicable Law – There is no case in this State which supports the Petitioner's claim.

> 3. "When a defendant has been convicted of two separate crimes, before sentence is pronounced for either, the trial court may, in its discretion, provide that the sentences run concurrently, and unless it does so provide, the sentences will run consecutively." Syllabus point 3, *Keene v. Leverette*, 163 W.Va. 98, 254 S.E.2d 700 (1979).
>
> 4. " 'A claim that double jeopardy has been violated based on multiple punishments imposed after a single trial is resolved by determining the legislative intent as to punishment.' Syllabus point 7, *State v. Gill*, 187 W.Va. 136, 416 S.E.2d 253 (1992)." Syllabus point 7, *State v. Easton*, 203 W.Va. 631, 510 S.E.2d 465 (1998).
>
> 5. " 'In ascertaining legislative intent, a court should look initially at the language of the involved statutes and, if necessary, the legislative history to determine if the legislature has made a clear expression of its intention to aggregate sentences for related crimes. If no such clear legislative intent can be discerned, then the court should analyze the statutes under the test set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to determine whether each offense requires an element of proof the other does not. If there is an element of proof that is different, then the presumption is that the legislature intended to create separate offenses.' Syllabus point 8, *State v. Gill*, 187 W.Va. 136, 416 S.E.2d 253 (1992)." Syllabus point 8, *State v. Easton*, 203 W.Va. 631, 510 S.E.2d 465 (1998).

Syl. Pts. 3, 4, & 5, *State v. Allen*, 208 W.Va. 144, 539 S.E.2d 87 (1999).

18

*See also, Keith v. Leverette*, 163 W.Va. 98, 254 S.E.2d 700 (1979)(State Supreme Court denied *habeas corpus* relief to a defendant who received consecutive sentences for "Felonious Assault" and "Conspiracy to Commit a Felony", finding that the crimes were two separate offenses for the purposes of sentencing, even though they occurred within the same transaction.); *State v. Broughton*, 196 W.Va. 281, 470 S.E.2d 413 (1996)(Defendant who was sentenced to consecutive sentences for "Delivery of Cocaine," "Delivery of Marijuana", and "Conspiracy to Deliver Marijuana" was not improper and did not violate double jeopardy principles, even though the convictions were for actions occurring within the same transaction.); *and, Hart v. Plumley*, Not Reported in S.E.2d 2013 WL 513183 (2013)(State Supreme Court denied *habeas corpus* relief to a defendant sentenced to consecutive sentences for "Sexual Abuse in the First Degree," "Robbery in the Second Degree," "Conspiracy to Commit Robbery in the First Degree," "Nighttime Robbery," "Conspiracy to Commit Nighttime Burglary," "Grand Larceny," and "Fleeing From an Officer By Means of a Vehicle Causing Damage to Property," – resulting in a sentence of 10 to 58 years – having found no error, despite the crimes arising out of the same series of events, and despite the co-defendants receiving concurrent sentences.)

C.    Relevant Facts – The Petitioner did not put on any evidence at the hearing, in regards to this claim.

19

D.   Analysis & Conclusions – On this issue, the case law speaks for itself. The Court finds that there is no merit to the Petitioner's third claim.

## IV.   FOURTH CLAIM: PETITIONER'S CONFESSION

A.   Petitioner's Claim – In his fourth claim, the Petitioner alleges that the trial court erred in admitting the Petitioner's confession to law enforcement. Petitioner claims that the statement was coerced "and therefore cannot be a valid basis for this conviction." In support of his assertion, the Petitioner points to the length of the interview – approximately six hours – during which the Petitioner says that he was "thoroughly intimidated" and was not free to leave.

B.   Applicable Law –

> Voluntariness of a confession and consequently its admissibility turn on the facts and circumstances of each case. Whether an admission is voluntary or induced by duress or coercion is to be determined from the totality of circumstances, including the setting in which the statement was obtained, the details of the interrogation, the characteristics of the accused (*i.e.*, his age, education, experience, and intelligence) and the absence of *Miranda* warnings. None of the above is dispositive alone.

Cleckley, Franklin D. *Handbook on West Virginia Criminal Procedure, Volume I*, pg. I-414, The Michie Company: Charlottesville, VA, 1998.

Ultimately, "prolonged *incommunicado* interrogation is one factor for consideration under the totality of the circumstances." *State v. Bradshaw*, 193 W.Va. 519, 534, 457 S.E.2d 456 (1995). In *Bradshaw*, the State Supreme Court, in

20

upholding the admission of the defendant's statement to police, held that the defendant did not show "that his *six hours* of questioning adversely affected him," and it was "clear from the video tape that there were breaks in the questioning and the police officers did not deprive the defendant of any necessities." *Id.* [Emphasis added.]

C.     Relevant Facts – The Petitioner was questioned by then-Lieutenant A. J. Boggs and then-Patrolman G. C. Burnem at the Warrick County Sheriff's Department in Warrick County, Indiana on September 19, 2007. According to the transcript of the Petitioner's statement, the questioning began at approximately 9:53 p.m. and ended at 3:20 a.m. The transcript also shows that the Petitioner was informed of his *Miranda* rights, as follows:

**BOGGS:** But before I ask you any questions, you must understand you rights. You have the right to remain silent. Anything that you say can and will be used against you in a court of law. You have the right to talk to a lawyer and to have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. I'm sorry. If you decide to answer questions at this time without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. Do you understand all this, Sam?

**WHITE:** Yes, sir.

*Transcript of Petitioner's Statement*, pg. 5. The Petitioner also initialed and signed a *Miranda Rights Waiver Form*, acknowledging that these rights were read to him, that he understood said rights, and that he was waiving the rights.

Then-Lieutenant Boggs and then-Patrolman Burnem testified at the pretrial hearing on September 5, 2008 and at the trial regarding the circumstances of taking the Petitioner's statement. According to the testimony, the Petitioner voluntarily agreed to be transported from his place of employment to the Warrick County Sheriff's Department, which was about a fifteen minute drive. *Trial Transcript: Volume III*, pgs. 81-82. When he was transported, and during the first part of the statement, the Petitioner was not under arrest, was free to leave, and was advised of the same. *Pretrial Transcript*, pg. 79. Approximately three to three-and-a-half hours into the interview, the officers informed the Petitioner that he was no longer free to leave, but the Petitioner agreed to continue the interview. *Pretrial Transcript*, pg. 80. The Petitioner was not arrested or placed in handcuffs until the conclusion of the interview. *Pretrial Transcript*, pg. 80.

During the course of the interview, the Petitioner, at all times, appeared coherent, and he appeared to be of at least average intelligence. *Pretrial*

22

*Transcript*, pg. 82. The Petitioner did not appear impaired in anyway, and did not appear to be under the influence of drugs and/or alcohol. *Pretrial Transcript*, pg. 82, lines 9-14; *Trial Transcript, Volume III*, pg. 85.

The officers did not threaten or intimidate the Petitioner in any way during the course of the interrogation. The entire interrogation was recorded by audio/video, *and* by digital audio.[8] At no time in either recording can there be seen any act of coercive or threatening behavior by either officer. In fact, at one point during the statement, the Petitioner's voice drops and he begins talking slowly; instead of becoming aggressive and getting in his face, then-Lieutenant Boggs mimics the Petitioner's behavior, and begins speaking softly and slowly, almost to the point where it becomes difficult to hear him. Moreover, the officers allowed for about a five minute restroom break to be taken. *Pretrial Transcript*, pg. 96-97; *Trial Transcript: Volume III*, pg. 88.

Although the interview occurred at night, the Petitioner was working night shifts at the time, such that the time of day of the interview would be congruent with the hours in which the Petitioner would normally be awake and active. Also, the officers did not fully begin the "interrogation" aspect of the interview until approximately sixty or seventy minutes into the interview. *Pretrial Transcript*, pg.

---

[8] The video portion of the audio/video recording was clear; however, because the audio quality was poor on the audio/video recording, it was the audio recording alone that was shown to the jury at trial.

81-82.

D.    Analysis & Conclusions — The recordings and the transcript of the interview demonstrate that the Petitioner was not only advised of his *Miranda* rights, but was also treated with respect and sympathy throughout.  He was not deprived of necessities, he was not kept up at a time of night for-which he was not accustomed to being awake during, he was not mistreated — either verbally or physically — and at all times he was aware of his rights.  Ultimately, this case echoes the case of *State v. Bradshaw*, and like the confession in *Bradshaw*, it was proper for the trial court to admit the Petitioner's confession in this case.

The Court finds that there is no merit to the Petitioner's fourth claim.

## V.    FIFTH CLAIM: VIOLATION OF *BRADY* REQUIREMENTS

A.    Petitioner's Claim — In his fifth claim, the Petitioner alleges that the then-prosecuting attorney, Shannon Baldwin, and the lead investigator, then-Lieutenant Boggs, presented false testimony at trial.  The Petitioner argues that the State had in its possession evidence which supported the Petitioner's belief that the victim was a danger to Ms. Osborne — including the issuance of protective orders in Person County, North Carolina — and willfully failed to disclose this evidence to the Petitioner.  The Petitioner claims that this is a violation of *Brady v. Maryland*, as it was exculpatory evidence.

24

B.    Applicable Law – In his filings, the Petitioner relies upon the United States Supreme Court case of *Brady v. Maryland*, and the West Virginia Supreme Court case of *State v. Youngblood*.

> A prosecution that withholds evidence on demand of an accuse which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice....

*Brady v. Maryland*, 373 U.S. 83, 88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

> 1. A police investigator's knowledge of evidence in a criminal case is imputed to the prosecutor. Therefore, a prosecutor's disclosure duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982) includes disclosure of evidence that is known only to a police investigator and not the prosecutor.

> 2. There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have seen suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., it must have prejudiced the defense at trial.

Syl. Pts. 1 and 2, *State v. Youngblood*, 221 W.Va. 20, 650 S.E.2d 119 (2007).

25

C.   Relevant Facts – At the evidentiary hearing, Mr. Clark testified that he was not certain whether he was aware of the domestic violence protection orders against Mr. Mahrous.

CLARK:   [Petitioner Exhibit number 3] appears to be equivalent to our domestic violence protection order proceedings in North Carolina, involving – well, one of them is someone named Cindy Clayton who – honestly, that name does not ring a bell – against Mohammed Mahrous for alleged civil domestic violence.

I honestly, Mr. Bayliss, can't tell I have seen the Cindy Clayton documents. I can't tell you I have, but I don't recall that name.

BAYLISS:   I understand.   Do you recall, otherwise, having possession of those documents from North Carolina?

CLARK:   I believe I had the ones related to Roseann [Osborne].

BAYLISS:   Okay.

CLARK:   I cannot state with any degree of certainty that I had the Cindy Clayton documents.   I may have, but I just honestly don't remember.

BAYLISS:   And with those documents, related to North Carolina domestic violence orders, *et cetera*, did you have those prior to the commencement of the trial?

CLARK:   I believe so, yes.

*Evidentiary Hearing Transcript*, pg. 14-15, lines 22-21.

Likewise, the Petitioner testified that he, too, was aware of the North Carolina domestic violence petitions.

26

**CASTO:** You were aware of the North Carolina issue, as far as it — I think it was a domestic violence petition, correct?

**WHITE:** Yes, ma'am.

**CASTO:** Okay. So even though Ms. Baldwin didn't give you that information, you were aware of it.

**WHITE:** Yes, ma'am. And I had notified both of my attorneys of it.

*Evidentiary Hearing Transcript*, pg. 43, lines 3-10.

Although the Petitioner claimed that Ms. Baldwin had the documents "locked up" in a cabinet until after his trial, *Evidentiary Hearing Transcript*, pg. 39, lines 14-22, the facts, as accepted by the State Supreme Court in *State v. White*, 228 W.Va. 530, 547, 722 S.E.2d 566 (2011), indicate that the State did not possess the records until February 2009, when the newly-elected Prosecuting Attorney James P. McHugh obtained the records in advance of the Roseann Osborne's trial.

D.     Analysis & Conclusions – The West Virginia Supreme Court has already ruled on this exact issue in *State v. White*, finding that *Brady v. Maryland* does not apply because the State was not in possession of the records in question until *after* the Petitioner's trial. *State v. White*, 228 W.Va. 530, 722 S.E.2d 566 (2011). Although Mr. Clark and the Petitioner have admitted that they were aware of the documents, there is no evidence to support the Petitioner's contention that the State had knowledge of the documents, much less possession. Ultimately, in

27

regards to the State's actions and knowledge, the facts remain the same as they were on appeal.

The Court finds that there is no merit to the Petitioner's fifth claim, as the claim is res adjudicata.

## VI. SIXTH CLAIM: COUNSEL'S INVESTIGATION OF CASE

A.   Petitioner's Claim – In his sixth claim, the Petitioner alleges that trial counsel erred in failing to "obtain, investigate[,] review and challenge, the composition of the grand jury or its procedures."

B.   Applicable Law – Rule 6 of the West Virginia Rules for Criminal Procedure states as follows:

> (b) Objections to grand jury and grand jurors. –
>
> (1) Challenges. – The prosecuting attorney or a defendant who has been held to answer in the circuit court may challenge the array of jurors on the ground that the grand jury was not selected, drawn, or summoned in accordance with law, and may challenge an individual juror on the ground that the juror is not legally qualified. Challenges shall be made before the administration of the oath to the jurors and shall be tried by the circuit court.
>
> (2) Motion to dismiss. - A motion to dismiss the indictment may be based on objections to the array or on the lack of legal qualifications of an individual juror, if not previously determined upon challenge. An indictment shall not be dismissed on the ground that one or more members of the grand jury were not legally qualified if it appears from the record kept pursuant to subdivision (c) of this rule that 12 or more jurors, after deducting the

28

number not legally qualified, concurred in finding the indictment.

C.  Relevant Facts – The Petitioner did not put on any evidence at the hearing, in regards to this claim.

D.  Analysis & Conclusions – Although *Losh v. McKenzie*, 166 W.Va. 762, 277 S.E.2d 606 (1981) cites "challenges to the composition of grand jury or its procedures" as a viable claim in a *habeas corpus* proceeding, the Respondent could not find a single case in West Virginia in which *habeas* relief was granted on the grounds of a defense attorney failing to challenge the composition of the grand jury.

The Court finds that there is no merit to the Petitioner's sixth claim.

## VII.  SEVENTH CLAIM: COUNSEL'S SUBPOENAS

A.  Petitioner's Claim – In his seventh claim, the Petitioner alleges that his trial counsel refused to subpoena "certain witnesses and records."

B.  Analysis & Conclusions – This claim is fully addressed in Subsection I of this *Order, supra.* The Court finds that there is no merit to the Petitioner's seventh claim.

## VIII. EIGHTH CLAIM: RENEWED MOTION FOR NEW TRIAL

A. Petitioner's Claim – In his eighth claim, the Petitioner alleges that the trial court violated his constitutional rights by denying him the opportunity to present evidence on his "Renewed Motion for New Trial."

B. Applicable Law – Rule 33 of the West Virginia Rules of Criminal Procedure states as follows:

> The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice. If trial was by the court without a jury the court on motion of a defendant for a new trial may vacate the judgment if entered, take additional testimony, and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within ten days after verdict or finding of guilty or within such further time as the court may fix during the ten-day period.

C. Relevant Facts – The Petitioner did not put on any evidence at the hearing, in regards to this claim.

D. Analysis & Conclusions – In *State v. White*, the State Supreme Court notes that the basis for the Petitioner's "Amended Renewed Motion for New Trial" was the alleged violation of *Brady v. Maryland*, which was discussed in Paragraph V, *supra*. *State v. White*, 228 W.Va. 530, 456. The Court found "no error in the trial court's denial of Mr. White's 'Amended Renewed Motion for New Trial' based on alleged *Brady* violations." *Id.*, 547. Further, there is nothing in the West

30

Virginia Rules of Criminal Procedure which requires a circuit court to allow a defendant to put on evidence in support of a motion for new trial.

The Court finds that there is no merit to the Petitioner's eighth claim.

## IX. NINTH CLAIM: STATEMENTS MADE BY TRIAL COURT

A.    Petitioner's Claim – In his ninth claim, the Petitioner alleges that the trial court made "inappropriate statements" to the jury.

B.    Relevant Facts – The Petitioner did not put on any evidence at the hearing, in regards to this claim.

C.    Analysis & Conclusions – The Petitioner has put forth no evidence that the trial court made "inappropriate statements" to the jury. The Court finds that there is no merit to the Petitioner's ninth claim.

## X. TENTH CLAIM: STATEMENTS MADE BY PROSECUTOR

A.    Petitioner's Claim – In his tenth claim, the Petitioner alleges that the prosecuting attorney made "inappropriate statements" to the jury.

B.    Applicable Law – The Petitioner did not put on any evidence at the hearing, in regards to this claim.

C.    Analysis & Conclusions – The Petitioner has put forth no evidence that the prosecuting attorney made "inappropriate statements" to the jury. The Court finds that there is no merit to the Petitioner's tenth claim.

## XI. ELEVENTH CLAIM: SUFFICIENCY OF EVIDENCE

31

A.    Petitioner's Claim – In his eleventh claim, the Petitioner alleges that there was insufficient evidence to support the jury's finding of guilt.

B.    Applicable Law – The standard for challenging the sufficiency of the evidence on a criminal conviction is well-established in this State.

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilty beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. Pt. 3, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

C.    Relevant Facts – In determining this claim, this Court relies upon the entirety of the trial transcript.

D.    Analysis & Conclusions – After careful consideration, the State Supreme Court held in the direct appeal of the criminal matter that there was, in fact, sufficient evidence to support findings of guilt on both counts. *State v. White*, 228 W.Va. at 539-42. The Court adopts the Court's legal and factual findings of

32

sufficiency, and further finds that, when viewed in the light most favorable to the State, there is sufficient evidence to support the conviction of the Petitioner.

The Court finds that there is no merit to the Petitioner's eleventh claim.

## XII. TWELFTH CLAIM: SEVERITY OF SENTENCE

A.    Petitioner's Claim – In his twelfth claim, the Petitioner alleges that the Petitioner received a severer sentence than "reasonably expected".

B.    Applicable Law – The West Virginia Code sets forth the penalties for "First Degree Murder" and "Conspiracy to Commit a Felony" as follows:

> If a person indicted for murder be found by the jury guilty thereof, they shall in their verdict find whether he or she is guilty of murder of the first degree or second degree. If the person indicted for murder is found by the jury guilty thereof, and if the jury find in their verdict that he or she is guilty of murder of the first degree, or if a person indicted for murder pleads guilty of murder of the first degree, he or she shall be punished by imprisonment in the penitentiary for life, and he or she, notwithstanding the provisions of article twelve, chapter sixty-two of this code, shall not be eligible for parole: *Provided, That the jury may, in their discretion, recommend mercy, and if such recommendation is added to their verdict, such person shall be eligible for parole in accordance with the provisions of said article twelve, except that, notwithstanding any other provision of this code to the contrary, such person shall not be eligible for parole until he or she has served fifteen years:* Provided, however, That if the accused pleads guilty of murder of the first degree, the court may, in its discretion, provide that such person shall be eligible for parole in accordance with the provisions of said article twelve, and, if the court so provides, such person shall be

33

eligible for parole in accordance with the provisions of said article twelve in the same manner and with like effect as if such person had been found guilty by the verdict of a jury and the jury had recommended mercy, except that, notwithstanding any provision of said article twelve or any other provision of this code to the contrary, such person shall not be eligible for parole until he or she has served fifteen years.

W.Va. Code, § 62-3-15. [Emphasis added.]

Any person who violates the provisions of this section by conspiring to commit an offense against the State which is a felony, or by conspiring to defraud the State, the state or any county board of education, or any county or municipality of the State, shall be guilty of a felony, and, upon conviction thereof, *shall be punished by imprisonment in the penitentiary for not less than one nor more than five years or by a fine of not more than ten thousand dollars, or, in the discretion of the court, by both such imprisonment and fine.* Any person who violates the provisions of this section by conspiring to commit an offense against the State which is a misdemeanor shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished by confinement in the county jail for not more than one year or by a fine of not more than one thousand dollars, or, in the discretion of the court, by both such confinement and fine.

W.Va. Code, § 61-10-31. [Emphasis added.]

C.    Relevant Facts – The Petitioner did not put on any evidence at the hearing, in regards to this claim.

D.    Analysis & Conclusions – The Petitioner's sentence followed the exact letter of the law: for the conviction of "First Degree Murder," life in prison

with the eligibility for parole after fifteen years; and for the conviction of "Conspiracy to Commit a Felony," an indeterminate term of not less than one nor more than five years in the penitentiary. Further, the trial court was within its discretion to impose a consecutive sentence, as discussed in Subsection III, *supra*.

The Court finds that there is no merit to the Petitioner's twelfth claim.

## XIII. THIRTEENTH CLAIM: EXCESSIVE SENTENCES

A. <u>Petitioner's Claim</u> – In his thirteenth claim, the Petitioner alleges that the sentences imposed were excessive.

B. <u>Applicable Law</u> – In Syllabus Point 2, *State v. Manley*, 212 W.Va. 509, 575 S.E.2d 119 (2002), the State Supreme Court held as follows:

> "Article III, Section 5 of the West Virginia Constitution, which contains the cruel and unusual punishment counterpart to the Eighth Amendment of the United States Constitution, has an express statement of the proportionality principle: 'Penalties shall be proportioned to the character and degree of the offence.' " Syllabus Point 8, *State v. Vance*, 164 W.Va. 216, 262 S.E.2d 423 (1980).

C. <u>Relevant Facts</u> – The Petitioner did not put on any evidence at the hearing, in regards to this claim.

D. <u>Analysis & Conclusions</u> – The Petitioner committed a bloody and violent murder, for which he will be eligible for parole in 2023. For the reasons set

forth in Subsections III and XII, *supra*, there is nothing excessive about the Petitioner's sentence.

The Court finds that there is no merit to the Petitioner's thirteenth claim.

## XIV. FOURTEENTH CLAIM: IMPAIRED COUNSEL

A. <u>Petitioner's Claim</u> — In his fourteenth claim, the Petitioner argues that trial counsel Jeremy Vickers was impaired by drugs and/or alcohol during the course of the trial, and such impairment "negatively impaired his ability to adequately represent [the Petitioner] at the trial of this matter." The Petitioner also notes that Mr. Vickers has been disbarred, and was criminally prosecuted for fraudulent activity stemming from his legal practice.

B. <u>Applicable Law</u> — The Court will assess this allegation — along with the similar allegation made in his first claim — utilizing the *Strickland/Miller* test for ineffective assistance of counsel, as set forth in Subsection I.B., *supra*.

C. <u>Relevant Facts</u> — At the Petitioner's trial, he was represented by Mr. Vickers and Mr. Clark. Both Mr. Clark and the Petitioner identified Mr. Clark as the lead counsel. *Evidentiary Hearing Transcript*, pg. 5, lines 17-22; and pg. 35, lines, 20-23. Mr. Clark testified that he had been lead counsel since the arraignment, and testified that the only stage he was not appointed for was the preliminary hearing. *Id.*, pg. 6, lines 1-7. Further, Mr. Clark testified that he was

responsible for 95% of the case, including motions, discovery, and trial, and that Mr. Clark "called the shots." *Id.*, pg. 6, lines 15-24.

This assertion is reflected in the trial transcript, which shows that Mr. Vickers handled some of the individual *voir dire*, delivered the opening statement, and cross examined three relatively minor State witnesses. On the other hand, Mr. Clark performed the general *voir dire* and remainder of the individual *voir dire*, cross examined the remaining thirteen State witnesses, presented all defense witnesses, and delivered the closing arguments to the jury.

Despite Mr. Vickers's relatively minor role in the case, the *Petition* claims that Mr. Vickers was not only intoxicated during the case, but that such intoxication negatively affected the outcome of the trial. However, at the evidentiary hearing, the Petitioner had little evidence in support to support either claim. The Petitioner admitted that Mr. Vickers appeared "oriented in regard to facts and circumstances" of the case, but complained that such orientation was negated because Mr. Vickers allegedly would inadvertently bring in other clients' case files when he met with the Petitioner at the regional jail. *Evidentiary Hearing Transcript*, pg. 34, lines 19-24. The Petitioner did not testify that Mr. Vickers appeared impaired, other than to note that he was often red-faced. *Id.*, pg. 35, lines 4-10. The Petitioner admitted that Mr. Vickers did not smell of alcohol, and that he appeared coherent. *Id.*, pg. 35, lines 11-19. The Petitioner did state that he was

37

dissatisfied with Mr. Vickers's opening statement, and because he felt that Mr. Vickers did a poor job, it was the Petitioner's assumption that there "had to have been something wrong with him." *Id.*, pg. 36, lines 3-15.

Furthermore, Mr. Clark testified that he knew Mr. Vickers from the time that Mr. Vickers was thirteen years old, and he believed that he "would have been able to determine whether [Mr. Vickers] was impaired to the extent that he could not function as an attorney." *Evidentiary Hearing Transcript*, pg. 7, lines 8-15. Mr. Clark testified that he did not notice anything in Mr. Vickers' behavior that led Mr. Clark to believe that he was impaired, whether during their meetings with the Petitioner at the regional jail, or during the course of the trial. *Id.*, pg. 7, lines 15-19. Further, Mr. Clark was unequivocal that at no time during client meetings or in court did Mr. Vickers appear inebriated or to have imbibed alcoholic beverages. *Id.*, pg. 8, lines 2-7.

D.    Analysis & Conclusions -- The Petitioner has not presented evidence sufficient to find that Mr. Vickers was impaired during the course of the case. The Petitioner's own testimony rationalizes the issue, rather than speaks to clear observations: Mr. Vickers gave a poor opening statement and sometimes brought other clients to meetings with the Petitioner, therefore, he must have been intoxicated, even though there were no other indicators that he was under the influence of drugs and/or alcohol. On the other hand, Mr. Clark was firm in his

38

belief that Mr. Vickers was not under the influence nor impaired during any client meeting or during any court proceeding relating to the Petitioner's case.

It should also be noted that the Petitioner's lead counsel, Mr. Clark, is a well-respected member of the Bar, whose reputation is beyond reproach. The Petitioner received the benefit of excellent counsel, and as noted in Subsection I, *supra*, such representation resulted in favorable verdict to the Petitioner. Ultimately, aside from innuendo relating to Mr. Vickers's later fall-from-grace, there is no evidence that Mr. Vickers was under the influence of drugs or alcohol during the course of the Petitioner's case, and there is certainly no evidence that such alleged impairment negatively impacted the Petitioner's case.

The Court finds that there is no merit to the Petitioner's fourteenth claim.

## XV. FIFTEENTH CLAIM: COMPENSATION FOR COUNSEL

A. <u>Petitioner's Claim</u> — In his fifteenth claim, the Petitioner argues that because the compensation rate for appointed counsel is so inadequate, that it "attracts lawyers with less experience, skills and invites errors such as the appointment of chronically impaired counsel like Mr. Vickers," and did so deprive the Petitioner of "his right to have adequate, competent counsel represent him at trial."

B. <u>Applicable Law</u> — This argument is, in essence, a claim of ineffective assistance of counsel. Therefore, the Court utilizes the *Strickland/Miller* test for

ineffective assistance of counsel, as set forth in Subsection I.B., *supra*. The law – as it relates to requiring adequate compensation of court-appointed counsel – is set forth in *Jewell v. Maynard*, 181 W.Va. 571, 383 S.E.2d 536 (1989), and for reasons discussed herein, the Court does not find it necessary to discuss this case in depth.

C.    Relevant Facts – Although the Petitioner put on evidence relating to Mr. Vickers's alleged short-comings, the Petitioner did not put on any evidence at the hearing, which directly linked Mr. Vickers's supposed impairment to a lack of compensation.

D.    Analysis & Conclusions – In this claim, the Petitioner, once again, alleges that Mr. Vickers was intoxicated during the Petitioner's case. The Court has already addressed the issue of Mr. Vickers's sobriety in Subsection XIV, *supra*. Beyond this already-addressed matter, the Petitioner does not allege any *actual prejudice* which he suffered. The poor compensation of appointed counsel in this State is not relevant in the current matter, unless and until the Petitioner can prove that failure to pay attorneys resulted in inadequate representation. An abstract argument that lack of pay leads to less competent counsel is not relevant absent actual evidence that the Petitioner *in this case* receive incompetent counsel, and that "but for" the lack of pay, he would have received competent counsel. Such evidence has not been presented, nor does this Court believe that it could be.

The Court finds that there is no merit to the Petitioner's fifteenth claim.

## XVI. ADDITIONAL CLAIM: CELL PHONE SEARCH

A.     Petitioner's Claim – In his *Motion to Continue and Motion for Leave to Amended Petition for Writ of Habeas Corpus*, the Petitioner alleges that the June 2014 United States Supreme Court ruling in *Riley v. California*, 134 S.Ct. 2473, 189 L.Ed.2d 430, 82 USLW 4558 (2014), reopens the issue of whether the search of the Petitioner's cell phone was lawful.

B.     Applicable Law – *Riley v. California* includes appeals by two petitioners: David Riley and Brima Wurie. In the first appeal, the police impounded Mr. Riley's car following a routine traffic stop. *Riley v. California*, 134 S.Ct. 2473, 2480. The police subsequently performed an inventory search of Mr. Riley's car, and located a "smart phone." *Riley*, at 2480-81. The officers accessed the information on the phone, including text messages, which eventually led to further investigation of Mr. Riley, resulting in charges connected to a gang shooting. *Id.*, at 2481.

In the second appeal, upon arresting Mr. Wurie, the police performed a search of Mr. Wurie's person, and located a "flip phone". *Riley*, at 2481. The police searched the phone, obtaining information which led to an execution of Mr. Wurie's residence, and yielded 215 grams of crack cocaine, marijuana, drug paraphernalia, a firearm and ammunition, and cash. *Id.*, at 2481-82.

41

The issue brought before the U.S. Supreme Court was "how the search incident to arrest doctrine applies to modern cell phones." *Riley*, at 2484. The Court relied upon a balancing test, finding that the Court "generally determine[s] whether to exempt a given type of search from the warrant requirement 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id.* *Quoting, Wyoming v. Houghton*, 526 U.S. 295, 300 (1999). Ultimately, the Court held that in the fact patterns presented in these cases, the searches were unreasonable.

C.    Relevant Facts – Following Mr. Mahrous's murder, law enforcement officers obtained a search warrant for a yellow Ford truck, and for "any personal property...belonging to [Mr. Mahrous] or his wife Roseann Osborne". *State v. White*, 228 W.Va. 530, 544 (2011). The truck in question was titled Mr. Mahrous's name, although it was driven to the park – the location of the murder – by Ms. Osborne. *Id.* During the search of the truck, officers located a telephone, which led investigators to the Petitioner, and "provided a foundation for additional search warrants for [the Petitioner's] cellular telephone account information and cellular telephone tower information." *Id.*

D.    Analysis & Conclusions – In the Petitioner's direct appeal of his conviction, the West Virginia Supreme Court found that the search of the

42

Petitioner's cell phone was lawful. In the appeal, the Petitioner relied upon "numerous cases involving telephones that were seized *without a warrant.*" *State v. White*, 228 W.Va. at 545. [Emphasis in original.] In the writ for *habeas corpus*, the Petitioner continues to rely upon a case which involves a telephone seized without a warrant. In *Riley*, the U.S. Supreme Court limited its ruling to warrantless searches incident to arrest; the ruling did not address cell phones which were seized incident to a valid search warrant. Although it is undeniable that the U.S. Supreme Court was clearly impressed by "the privacies of life" which may be contained in a handheld cell phone and the need to protect such privacies from unreasonable searches, the U.S. Supreme Court did not find that law enforcement must obtain a search warrant to search the contents of a cell phone seized incident to a valid search warrant. *Riley v. California*, 124 S.Ct. at 2495.

While the ruling in *Riley* surely calls for caution in the search of cell phones, it does not directly contradict or overturn the ruling in *White*.

> Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. A warrant to open a footlocker to search for marijuana would also authorize the opening of packages found inside. A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search.

43

*White*, at 545. "Furthermore it has been observed generally that an additional warrant is not required to examine seized objects." *Id.*, at 545-46.

> Accordingly, we now expressly hold that, when searching a vehicle pursuant to a valid search warrant, no additional search warrant is required to examine the contents of items that are properly seized in the execution of the warrant, including, but not limited to, cellular telephones.

Syl. Pt. 14, *State v. White*, 228 W.Va. 530, 546. At this point, the West Virginia Supreme Court's ruling in *State v. White* remains controlling law in this State. This issue has been decided by the Supreme Court of Appeals in the direct appeal; therefore, it is res adjudicata. The Court finds that there is no merit to the Petitioner's supplemental claim.

## RULING

Based on the foregoing, and after careful consideration of the facts, arguments, and the law, this Court hereby **DENIES** the *Amended Petition for Writ of Habeas Corpus*, as well as any supplemental claims set forth by the Petitioner during the course of these proceedings. The Court hereby **ORDERS** this matter **DISMISSED**, and **STRICKEN** from the docket.

The Clerk shall forward a copy of this Order to the Prosecuting Attorney; to Shawn Bayliss, attorney for Petitioner; and, to the Petitioner, Larry S. White, II.

All of which is ORDERED, accordingly.

ENTER: October 28, 2014

_____
Thomas C. Evans, III, Circuit Judge

11-C-29

RECORDED
2014 OCT 28 PM 3: 51
BRUCE W. DEWEES
JACKSON COUNTY
CIRCUIT CLERK
BRI??? ??3527?

45

A TRUE COPY, CERTIFIED THIS THE

DEC - 2 2014

_Bruce W DeWees_
CLERK CIRCUIT COURT
OF JACKSON COUNTY, WEST VIRGINIA

# IN THE CIRCUIT COURT OF JACKSON COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA, *ex rel*
LARRY S. WHITE,
  Petitioner,

v.

CASE NO. 11-C-29
Honorable Thomas C. Evans, III

ADRIAN HOKE, Warden,
  Respondent.

## ORDER EXTENDING TIME FOR FILING OF PETITION

On this day came the Petitioner, Larry S. White, by and through his counsel, Shawn D. Bayliss and requested an extension of time in which to file a Petition for Appeal to the West Virginia Supreme Court of Appeals.

The Court, after mature consideration of said request for an extension of time, does for good cause shown, hereby GRANT the same.

Accordingly, it is hereby ORDERED that the Petitioner shall have until the 15th day of December, 2014, to file said Petition.

The Clerk is instructed to forward attested copies of this order to (1) Shawn D. Bayliss; (2) Petitioner Larry White, Huttonsville Correctional Center; and (3) the Jackson County Prosecuting Attorney.

ENTERED: 12/9/14

*Thomas C. Evans III*

The Honorable Thomas C. Evans, III
Fifth Judicial Circuit
State of West Virginia

A TRUE COPY, CERTIFIED THIS THE

**DEC 1 0 2014**

*Bruce W DeWeese*
CLERK CIRCUIT COURT
OF JACKSON COUNTY, WEST VIRGINIA

