# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

*In re* **N.T.**

**No. 24-729** (Harrison County CC-17-2024-JA-42)

**and**

*In re* **N.T.**

**No. 25-239** (Harrison County CC-17-2024-JA-42)

## MEMORANDUM DECISION

Petitioner Father D.H.[1] appeals the Circuit Court of Harrison County's November 13, 2024, order adjudicating him as a neglecting parent of N.T.[2] and its March 18, 2025, order terminating his parental, custodial, and guardianship rights to N.T. The petitioner argues that the circuit court erred in adjudicating him as a neglecting parent and in terminating his rights to N.T. Upon our review, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21.

In March 2024, the DHS filed an abuse and neglect petition against the mother alleging that she failed to provide the child, then eight years old, with safe and suitable living conditions and emotionally abused the child. The DHS listed the father as unknown in the petition based on the mother's representations that the child did not have contact with a father and no father was listed on the child's birth certificate. At a hearing in May 2024, the mother voluntarily relinquished her parental rights to the child and identified the petitioner as the child's father. As a result, the DHS filed an amended petition identifying the petitioner as the child's putative father. According to the amended petition, the mother informed the petitioner that she was pregnant, and the petitioner told her that he did not want to have anything to do with the child. The DHS alleged that the petitioner knew or should have known that the mother became pregnant following an intimate relationship and that he had demonstrated a settled purpose to forgo his parental duties and

---

[1] Petitioner Father appears by counsel Amanda J. Ray. The West Virginia Department of Human Services ("DHS") appears by counsel Attorney General John B. McCuskey and Assistant Attorney General Kristen E. Ross. Counsel Marci R. Carroll appears as the child's guardian ad litem ("guardian"). Upon motion by the DHS, the Court has consolidated these matters for resolution.

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

1

responsibilities to the child. In July 2024, a paternity test confirmed the petitioner as the child's father. The petitioner filed a motion for a preadjudicatory improvement period the following month.

In September 2024, the court held a contested adjudicatory hearing during which the DHS presented testimony from the mother and the petitioner. The mother testified that she met the petitioner in 2014 through a dating website and that she became pregnant by him shortly thereafter. She explained that she told the petitioner she was pregnant via text message because he refused to meet with her and that the petitioner responded by telling her that he did not want to be listed as the child's father on the birth certificate. According to the mother, the petitioner knew her phone number, full name, and where she worked. She stated that the petitioner could have sent her messages through the dating website, social media, or her cell phone.

The petitioner offered conflicting testimony. He conceded that the mother told him she was pregnant. However, he claimed that he responded by asking the mother to send him proof, which he never received because the mother "just kept wanting to meet up." The petitioner admitted that the mother eventually stopped messaging him and he never reached out to her again because he assumed that she was either not pregnant or that someone else was the father. He testified, "I left the ball in her court to, like, show me that [she was pregnant], and she had ways of getting a hold of me." The petitioner also disputed the mother's testimony regarding certain details of their relationship and his ability to contact her. Specifically, he claimed that their relationship lasted a total of two or three weeks and that he did not know the mother's actual name or where she worked. He also claimed that he was unable to follow up with the mother since 2014 because he did not have enough information to find her on social media and he stopped using the dating website. On cross-examination, the petitioner revealed that, when he met the mother, he was on "a small break" from his relationship with the woman to whom he is now married. He thought that the mother was trying to "keep [him] on the hook" because she wanted to move in with him and did not want him to reconcile with his wife.

After considering the evidence, the circuit court determined that the mother's testimony was "more credible, detailed, and persuasive" than the petitioner's testimony and that his testimony "should be given less weight." The court found that "[d]espite having in fact, by his own admission, been put on notice by [the mother] in a timely manner after their sexual encounters that he may have fathered a child with her, [the petitioner] did nothing to determine whether [she] had become pregnant by him." The court further found that the petitioner failed to provide for the child financially or emotionally; to have contact with the child; or to inquire about the child's health, welfare, and safety. Based on those findings, the court reasoned that the petitioner had abandoned the child because he "conducted himself in a manner that demonstrate[d] the settled purpose to forego his duties and parental responsibilities to the infant child." As such, the court adjudicated the petitioner as a neglecting parent due to abandonment and N.T. as a neglected child. The court also denied the petitioner's motion for a preadjudicatory improvement period, observing that the petitioner "failed to acknowledge in any meaningful way his culpability in the underlying neglect, namely abandonment, of the infant child" and blamed the mother for failing to provide him with proof of the pregnancy. Finally, the court noted that abandonment constituted aggravated circumstances. The petitioner timely appealed from the adjudicatory order, which was entered on November 13, 2024.

The circuit court held dispositional hearings in December 2024 and January 2025. The court first heard testimony from the child's therapist, who was qualified as an expert in individual child therapy without objection. She testified that each time she tried to talk about the petitioner with the child, the child became "emotionally overwhelmed" and "just shut down." She explained that the child repeatedly stated that he did not want to talk about or get to know the petitioner and declined her suggestion to write the petitioner a letter. The therapist observed that the child felt safe and secure in his kinship placement, referred to them as his parents, and was stabilizing in their care. She opined that continuing therapy would not be beneficial for the child, that forcing the child to communicate with or visit the petitioner was not in the child's best interest, and that the child was not ready to participate in therapeutic visits with the petitioner nor would he be ready in the near future.

The case worker testified that the DHS provided parenting classes to the petitioner and acknowledged that the petitioner had requested therapeutic visits with the child. However, she explained that the DHS did not provide that service based on the recommendation of the child's therapist. The case worker also explained there were no other services that the DHS could offer the petitioner because he failed to genuinely admit that he abandoned the child. Additionally, the case worker testified that the child needed security and indicated that he was stable in his placement with his maternal aunt and uncle, with whom he had been placed since December 2023 and who were a "fixture in his life" prior to the abuse and neglect case.

The petitioner testified that he "made a mistake," that he "was sorry about the way everything played out," and that he "really wish[ed] that [he] had known" about the child. When asked by his attorney whether he felt like he had accepted responsibility "for not doing more," the petitioner stated that he did not "know a lot of answers on what [he] could've done differently" because he "didn't even have all the information," but he "wish[ed] that [he] could've done something different." The petitioner further testified that he could correct his past mistakes if the DHS provided therapeutic visits because "everything probably [could] be solved by talking." He complained that "nobody seem[ed] to . . . believe [him]" and that everyone thought he was "a bad guy for whatever reason." On cross-examination, the petitioner complained that the child did not want a relationship with him because the child did not "have the full picture" and asserted that the child would "feel differently" if he met him. When asked whether he thought his absence from the child's life impacted the child, the petitioner responded, "I mean, based on what people are saying, he don't even give two thoughts about me, so, I mean, I'm guessing from what you guys are saying, like, I didn't affect him a whole lot, because he don't even care about me."

Finally, the court heard testimony from the psychologist who administered the petitioner's parental fitness evaluation. The psychologist opined that the petitioner was a "fit parent" and that he had the parental capacity to care, protect, and change to adequately care for children. However, she clarified that her assessment was not specific to his parenting capabilities of a particular child.

Based on the evidence, the court found that there was no reasonable likelihood that the conditions of abuse or neglect could be substantially corrected in the near future because the petitioner "lack[ed] the capacity to solve the problems of neglect" for which he was adjudicated; "failed to acknowledge his role, specifically his abandonment of the child, . . . which clearly

3

demonstrates that the child's best interest is not his primary concern" and that he could not "correct a problem which he steadfastly refuse[d] to genuinely acknowledge"; and was unable to put the best interests of the child over his own wishes. Additionally, the court observed that the DHS was not required to provide services to the petitioner because of the aggravated circumstances, that placing the child with the petitioner "would be an attempt to 'unify' the parties not 'reunify,'" and that engaging in therapeutic visitation with the petitioner was not in the child's best interests. The court further found that termination of the petitioner's parental, custodial, and guardianship rights was necessary for the child's welfare because the child needed continuity of care and caretakers and was bonded with his kinship placement "where he can achieve permanency." As such, the court terminated the petitioner's rights.[3] The petitioner appeals from the adjudicatory and dispositional orders.

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo. Syl. Pt. 1, *In re Cecil T*., 228 W. Va. 89, 717 S.E.2d 873 (2011). At the outset, we note that eight[4] of the petitioner's combined thirteen assignments of error fail to include citation to or application of any controlling authority. This failure violates Rule 10(c)(7) of our Rules of Appellate Procedure, which requires that "[t]he brief must contain an argument exhibiting clearly the points of fact and law presented, the standard of review applicable, and citing the authorities relied on" and permits the Court to "disregard errors that are not adequately supported by specific references to the record on appeal." In an Administrative Order entered December 10, 2012, Re: Filings That Do Not Comply With the Rules of Appellate Procedure, this Court specifically noted that "[b]riefs that lack citation of authority [or] fail to structure an argument applying applicable law" and "[b]riefs with arguments

---

[3] The permanency plan for the child is adoption in his current placement.

[4] The assignments of error were (1) whether the DHS "ma[d]e reasonable efforts to ascertain the biological father when the referral came into the [DHS] prior to the filing of the Petition"; (2) whether "the Circuit Court err[ed] in finding the [petitioner] abandoned this child to [sic] birth when there was a prior abuse and neglect proceeding before the court that was later dismissed and the minor child returned to the biological mother when the father was known, and yet not served or made part of those proceedings"; (3) whether "the prior proceedings and dismissal of [the 2018 abuse and neglect] case in 2019 make abandonment . . . moot and previously litigated from the child's birth until the dismissal of that case in 2019"; (4) whether "the [DHS's] lack of due diligence in ascertaining the paternity of the minor child and ensuring that [the petitioner] was listed on the original Petition in 2018, correlate to direct evidence of improper management of the case"; (5) whether "the untimely filing of several Orders in the case . . . [is] clear evidence of mismanagement of the case"; (6) whether the circuit court "erred in not ensuring that the case was properly managed with the timely filing and entry of orders [and] promptly dealing with objections"; (7) whether the circuit court "erred in giving more weight to the actions of the Petitioner from ten years ago while not considering his active participation in the underlying case as proof that he was willing and able to participate in an improvement period and work to cure the problem that led to the filing of the Amended Petition"; and (8) whether "[t]he [circuit] Court erred in terminating the parental rights of a parent who had been evaluated and deemed as a fit parent, with the capacity to care, protect and change in order to provide for a child."

that do not contain a citation to legal authority to support the argument presented" are not in compliance with this Court's rules. In that order we also cautioned that "[p]ursuant to Rule 10(j), failure to file a compliant brief 'may result in the Supreme Court refusing to consider the case, denying argument to the derelict party, dismissing the case from the docket, or imposing such other sanctions as the Court may deem appropriate.'" Accordingly, the Court will not address these assignments of error on appeal. *See State v. White*, 228 W. Va. 530, 541 n.9, 722 S.E.2d 566, 577 n.9 (2011) ("Typically, this Court will not address issues that have not been properly briefed."); *State v. Larry A.H.*, 230 W. Va. 709, 716, 742 S.E.2d 125, 132 (2013) (explaining that "issues . . . not supported by pertinent authority, are not considered on appeal" (quoting *State v. LaRock*, 196 W. Va. 294, 302, 470 S.E.2d 613, 621 (1996))). Further, we will consolidate and restate the petitioner's remaining five assignments of error for purposes of clarity and brevity. *See Tudor's Biscuit World of Am. v. Critchley*, 229 W. Va. 396, 401-02, 729 S.E.2d 231, 236-37 (2012) (consolidating related or redundant assignments of error); *Jacquelyn F. v. Andrea R.*, No. 16-0585, 2017 WL 2608425, at *1 n.2 (W. Va. June 16, 2017) (memorandum decision) (restating assignments of error where they involve clearly related issues).

Before this Court, the petitioner first argues that his adjudication was erroneous because the DHS failed to prove by clear and convincing evidence that his conduct constituted abandonment. The petitioner argues that the DHS was required to "prove by clear and convincing evidence that the [petitioner] failed to make reasonable efforts to ascertain that a pregnancy and birth of a child had occurred" and that he "had the necessary information to ascertain that a child had been born and where the . . . [m]other and/or child resided."[5] The petitioner claims that he had no knowledge that the child was born because "he did not receive proof and heard nothing further from" the mother. He also claims that he lacked "any reasonable way to follow up to confirm whether the potential pregnancy resulted in a child" because he did not know the mother's address, phone number, or legal name. In his reply brief, the petitioner expands on this argument and asserts that the definition of abandonment set forth in West Virginia Code § 49-1-201 "presupposes that a child exists and that the parent undertakes actions such as failing to provide for a child and avoiding parental responsibilities to a child." We find no merit to this argument.

This Court has held that

[West Virginia Code § 49-4-601(i)], requires the [DHS], in a child abuse or neglect case, to prove "conditions existing at the time of the filing of the petition . . . by

---

[5] In advancing this argument, the petitioner relies on West Virginia Code § 48-22-306, which sets forth situations in which abandonment is presumed for purposes of *adoption* proceedings. However, we have repeatedly explained that West Virginia Code § 48-22-306 is not controlling authority in abuse and neglect proceedings. *See In re T.M.*, No. 19-0779, 2020 WL 2043308, at *3 n.4 (W. Va. Apr. 28, 2020) (memorandum decision) (noting that West Virginia Code § 48-22-306 was not controlling authority regarding abandonment in abuse and neglect proceedings); *In re A.L.*, No. 19-0646, 2020 WL 1674037, at *3 n.5 (W. Va. Apr. 6, 2020) (memorandum decision) (same); *In re A.B.*, No. 18-1147, 2019 WL 245277, at *3 (W. Va. Jun. 12, 2019) (memorandum decision) (same). As such, the petitioner is entitled to no relief for any arguments predicated on this statute.

clear and convincing [evidence]." The statute, however, does not specify any particular manner or mode of testimony or evidence by which the [DHS] is obligated to meet this burden."

Syl. Pt. 1, *In re S.C.*, 168 W. Va. 366, 284 S.E.2d 867 (1981). West Virginia Code § 49-1-201 defines a neglected child as one "[w]hose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent . . . to supply the child with necessary food, clothing, shelter, supervision, medical care, or education." This section also defines "abandonment" as "any conduct that demonstrates the settled purpose to forego the duties and parental responsibilities to the child." *Id.* Further, we have explained that "[t]here can be no more definitive proof of a parent's 'settled purpose to forego the duties and parental responsibilities to the child' than a total abdication of any responsibility for the child." *In re A.B.*, 2019 WL 245277, at *3; *see also In re C.M.-1*, 247 W. Va. 744, 749, 885 S.E.2d 875, 880 (2023) (quoting *In re R.R.*, No. 17-0930, 2018 WL 1251845, at *3 (W. Va. March 12, 2018) (memorandum decision) ("[N]on-custodial parents are expected to show interest in the child's welfare and provide financial and emotional support for the child; a failure to do so is strong evidence of abandonment.").

Here, the record is replete with evidence demonstrating that the petitioner neglected the child and that he had a settled purpose to forego his duties and parental responsibilities upon learning of the mother's pregnancy. The petitioner admitted that the mother told him that she was pregnant with *his* child. Despite this, the petitioner made no effort to stay in contact with the mother; ask for any basic identifying information, such as her full name; or attempt to follow up with her nine months later to ascertain whether the child was born. In fact, the petitioner testified that he refused to meet with the mother as she requested on multiple occasions and he made no effort to contact her through any available means since 2014. This willful ignorance demonstrates that the petitioner had no interest in providing for the child's basic needs or otherwise fulfilling his parental duties or responsibilities to the child. As a result, the petitioner was absent from the first nine years of the child's life and failed to provide him with financial support, food, clothing, shelter, supervision, medical care, or education. Accordingly, we see no error in the circuit court's adjudication of the petitioner as a neglecting parent based on abandonment.

The petitioner next argues that the circuit court erred in finding that abandonment constituted aggravated circumstances because "no evidence, testimony, or specific allegations were ever presented at trial regarding aggravated circumstances and a finding of aggravated circumstances was not requested at the adjudicatory hearing." We find no merit to this argument. We recently observed that

> a finding of "aggravated circumstances" refers to a specific set of *factual* circumstances under West Virginia Code § 49-4-604(c)(7)(A). Under that subpart, circuit courts may make appropriate findings that absolve DHS of making reasonable efforts to preserve the family (i.e., provide services) in certain situations that include "*abandonment*, torture, chronic abuse, and sexual abuse."

*In re K.V.*, 251 W. Va. 418, -- n.10, 914 S.E.2d 517, 525 n.10 (2025) (quoting W. Va. Code § 49-4-604(c)(7)(A)) (emphasis added). Here, the DHS alleged that the petitioner abandoned the child, and the court adjudicated the petitioner as a neglecting parent because of his abandonment.

Thus, based on the plain language of West Virginia Code § 49-4-604(c)(7)(A), the circuit court appropriately found that abandonment constituted an aggravated circumstance. As such, the petitioner is entitled to no relief in this regard.

The petitioner further argues that the DHS failed to provide "reasonable reunification services," specifically therapeutic visitation, and that the circuit court "should have ensured that these services were provided as required by law or made the [DHS] explain how the offering of these services would harm the safety and wellbeing of the minor child." We disagree. West Virginia Code § 49-4-601(d) requires the DHS to "provide supportive services in an effort to remedy circumstances detrimental to a child" immediately upon the filing of the petition, and the circuit court must consider "whether or not the [DHS] made reasonable efforts . . . to preserve the family" prior to terminating a parent's rights. *See id.* § 49-4-604(c)(6)(C)(iii). However, as explained above, the DHS was relieved of its obligation to provide reunification services because the court found that the petitioner abandoned the child. *See id.* § 49-4-604(c)(7)(A) ("[T]he department is not required to make reasonable efforts to preserve the family if the court determines . . . [t]he parent has subjected the child . . . to aggravated circumstances which include, but are not limited to, abandonment."). When, as the record in this case shows, a father abandons his child from birth and continues his abandonment of his child uninterrupted for a decade, his complaint that the department has now failed to make reasonable efforts to preserve his family is without legal authority. Nevertheless, the record shows that the DHS made reasonable efforts to unite the child with the petitioner by providing the child with therapy services and the petitioner with parenting classes. Moreover, contrary to the petitioner's contention, the DHS explained that it did not provide "therapeutic visitation" services because of the therapist's recommendation against it. Indeed, the circuit court found that forcing the child to create a bond with the petitioner not in his best interest. Therefore, we see no reversible error.

Finally, the petitioner argues that the circuit court erred in terminating his parental, custodial, and guardianship rights because the DHS "did not prove by clear and convincing evidence all of the elements in West Virginia Code §49-4-604 . . . to support a termination of . . . rights." [6] He claims that "he is a fit parent, capable of providing a safe and suitable home for the minor child" and that there was no evidence suggesting that he "could not or had not substantially cured the problem" for which he was adjudicated "other than what he was not allowed to cure by the [DHS] through meeting the child and participating in therapeutic visitation services." In his reply brief, the petitioner complains that "there were no grounds or reason not to return the child to [the petitioner], no argument to be made that the child would not be safe, and certainly no argument that child would be in imminent danger or at risk of any harm due to his return." He then claims that the circuit court terminated his rights "because ten years ago a good man did not follow up more aggressively on a text from a woman he hooked up with but whose full name and address he did not bother to get." We find this argument unpersuasive.

---

[6] The petitioner relies on West Virginia Code § 49-4-604(c)(5) to support his argument that the circuit court failed to make the requisite findings for termination of his rights. However, the court terminated the petitioner's rights under § 49-4-604(c)(6). As such, we will review the petitioner's argument that the court erred in terminating his rights in accordance with the proper statutory subsection and relevant case law.

West Virginia Code § 49-4-604(c)(6) permits a circuit court to terminate the parental, custodial, and guardianship rights of a neglecting parent "[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare of the child." West Virginia Code § 49-4-604(d) defines "[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected" to mean that, "based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help." The statute unambiguously provides that such conditions exist when "[t]he abusing parent or parents have abandoned the child." *Id.* § 49-4-604(d)(4).

As there was no error in the circuit court's finding that the petitioner abandoned the child, there is likewise no error in the circuit court's finding that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future. Beyond that, the circuit court found that the petitioner could not correct the conditions of neglect because he refused to acknowledge his abandonment of the child. Indeed, after reviewing the record, we note that the petitioner never admitted that he *abandoned* the child. Instead, the petitioner merely apologized for his "ignorance of the law" and stated that he "should have done more to find out if [he] fathered a child." He also maintained that he "didn't know" about the child until he was served with the amended petition and blamed the mother for his absence in the child's life. Even on appeal, the petitioner attempts to minimize his conduct and the impact it had on the child. Thus, the petitioner's inability to acknowledge that his actions constituted abandonment proves that he lacked the capacity to remedy the conditions of neglect. *See In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) ("[I]n order to remedy the abuse and/or neglect problem, the parent must recognize and acknowledge that his or her conduct constituted abuse.").

Furthermore, the record is replete with evidence supporting the circuit court's finding that termination of the petitioner's rights was necessary for the child's welfare. The child's therapist testified that the child needed stability and permanency because of the neglect he had endured and that he was settled and secure in his current placement. *See In re A.P.*, 245 W. Va. 248, 255, 858 S.E.2d 873, 880 (2021) (explaining that the "'and[ ] when necessary for the welfare of the child' requirement [of West Virginia Code § 49-4-604(c)(6)] concerns itself with the particular needs of the child as pertains to his or her physical and emotional well-being" (quoting W. Va. Code § 49-4-604(c)(6)) (first alteration in original). Moreover, the evidence demonstrated that the petitioner did not appreciate the child's emotional needs or well-being as he was unable to comprehend that his actions harmed the child or that forcing the child to participate in visits or talk about their "problems" would be against the child's best interest. Accordingly, we see no error in the circuit court's decision to terminate the petitioner's parental, custodial, and guardianship rights.

For the foregoing reasons, we affirm the circuit court's November 13, 2024, and March 18, 2025, orders.

Affirmed.

8

**ISSUED:** January 29, 2026

**CONCURRED IN BY:**

Chief Justice C. Haley Bunn
Justice William R. Wooton
Justice Charles S. Trump IV
Justice Thomas H. Ewing
Justice Gerald M. Titus III